Michael D. VAN STAN, Plaintiff–Appellee, Cross–Appellant,

v.

FANCY COLOURS & COMPANY, Defendant–Appellant, Cross–Appellee.

Nos. 96–3604, 96–3684.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1997.

Decided Sept. 15, 1997.

---

Paul K. Vickrey, Patrick Francis Solon (argued), Niro, Scavone, Haller & Niro, Chicago, IL, for Michael D. Van Stan.

Todd J. Kaiser, Kevin C. Schiferl (argued), Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, Roger Goble, Buffalo Grove, IL, for Fancy Colours & Company in 96–3604.

Roger Goble (argued), Buffalo Grove, IL, for Fancy Colours & Company in 96–3684.

Before CUMMINGS, WOOD, Jr. and DIANE P. WOOD, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.

After Fancy Colours & Company ("Fancy Colours") terminated his employment, Michael D. Van Stan ("Van Stan") sued Fancy Colours contending that it fired him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and that Fancy Colours' conduct in firing him amount-

ed to intentional infliction of emotional distress. A jury awarded Van Stan damages of $150,000 for intentional infliction of emotional distress but determined that Fancy Colours had not violated the ADA. After the court denied their respective posttrial motions, the parties filed the instant cross-appeals. Fancy Colours claims that it is entitled to judgment as a matter of law on the intentional infliction of emotional distress claim, while Van Stan contends that an evidentiary error warrants a new trial on his ADA claim. We affirm the entry of judgment in favor of Fancy Colours on the ADA claim, but we reverse the entry of judgment against Fancy Colours on the intentional infliction of emotional distress claim.

## I. Background

Fancy Colours is a family-owned business that sells paints and related products from 10 stores in the Chicago metropolitan area. In 1986, Van Stan began working in the Fancy Colours' warehouse in Schaumburg, Illinois, and shortly thereafter he became the warehouse manager. In 1991, Van Stan was diagnosed with a bipolar disorder. He maintains that he immediately told several Fancy Colours employees including Michael Feltes, Fancy Colours' Executive Vice President and General Manager, about his diagnosis. However, Van Stan did not seek any alteration in his work duties at that time, and his disorder apparently did not affect his job responsibilities or job performance until sometime in 1993 or 1994. Van Stan also suffered a stroke while at the warehouse. He missed eight days of work following the stroke, but the stroke seemingly had no other effect on his work duties or performance.

When the problems between Van Stan and Fancy Colours began to arise is hard to determine with certainty because the parties dispute the events leading up to Van Stan's dismissal. Apparently, however, the trouble began sometime in early 1994. Al Walters, Fancy Colours' Vice President of Operations and Van Stan's immediate supervisor, testified that he spoke with Van Stan about problems with Van Stan's job performance numerous times, particularly in early 1994. For example, he testified that he spoke to Van Stan after the entire warehouse staff complained to him about Van Stan's management style and threatened to quit. In addition, Walters testified that Van Stan committed a serious breach of company policy when he left the office in the middle of the day on May 3, 1994. Walters testified that after Van Stan and Harry Wallace, the manager of the Schaumburg retail store, "engaged in a bit of a shouting match" about whether Van Stan and his crew threw coffee grounds on the walls of the coffee room, Van Stan left the warehouse, placing his keys and pager on his desk. When Walters discovered that Van Stan had left the warehouse, he telephoned Van Stan at home, and Van Stan told him, "I've had it. I'm fed up. I quit."

Walters further testified that about two weeks after the "coffee ground incident," Van Stan showed him a doctor's note recommending that Van Stan's workload be reduced to 50 hours per week. Because he was busy and because he had already decided to fire Van Stan, Walters testified that he merely told Van Stan that he had no problem with the reduced schedule. Within a week of showing Walters the note, Van Stan went on a scheduled vacation, and Walters arranged to have another employee cover for Van Stan. The employee did such a good job cleaning up the warehouse that Walters felt comfortable with his previous decision to fire Van Stan and, consequently, did fire him.

Van Stan, on the other hand, testified that he received nothing but praise for his job performance during his tenure at Fancy Colours. He did not dispute that he left work following the coffee ground incident, but he maintained that it took place in February 1994 and that he did not resign and then agree to return to work as a result of the incident. He also testified that he showed the doctor's note to Feltes, the person at Fancy Colours whom Van Stan had informed of his bipolar disorder.

In any event, both parties agree that Fancy Colours terminated Van Stan's employment shortly after someone at Fancy Colours received the note from Van Stan's doctor. The parties agree that in May 1994, Walters telephoned Van Stan at his home while he was on a scheduled vacation to inform him

that Fancy Colours was terminating his employment. When Walters broke the news to Van Stan, Van Stan asked Walters why he was terminating his employment and Walters responded "low productivity" and poor people management skills.

Following his dismissal, Feltes gave Van Stan a letter of recommendation, and Van Stan obtained a job as a warehouse manager at another company. However, Van Stan also filed a charge with the EEOC, contending that Fancy Colours discharged him because he has a bipolar disorder and because he sought a reduced workload to accommodate his disorder. After he received a right-to-sue letter, he filed the instant action contending that Fancy Colours fired him in violation of the ADA and that Fancy Colours' conduct in terminating his employment amounted to intentional infliction of emotional distress. After a jury found in favor of Fancy Colours on the ADA claim but awarded Van Stan damages for intentional infliction of emotional distress, both the parties filed post-trial motions. Van Stan filed a motion for a new trial on the ADA claim, while Fancy Colours filed a motion for judgment as a matter of law on the intentional infliction of emotional distress claim. The district court denied both motions, and the parties cross-appealed.

## II. Discussion

### A. Fancy Colours' Appeal

Fancy Colours contends that the district court improperly denied its motion for judgment as a matter of law because Van Stan presented insufficient evidence to support the jury's verdict in favor of him on his intentional infliction of emotional distress claim. We review the district court's order *de novo.* However, we will not reverse unless we determine that no reasonable juror could have found that Van Stan established all of the elements of his claim. *Mangren Research & Dev. Corp. v. Nat'l Chemical Co.,* 87 F.3d 937, 941 (7th Cir.1996). Additionally, we must view all of the evidence in the light most favorable to Van Stan and draw all reasonable inferences in favor of him. *Id.*; *see also Bristow v. Drake St. Inc.,* 41 F.3d 345, 349 (7th Cir.1996).

Under Illinois law, which the parties both agree applies, a plaintiff may recover damages for intentional infliction of emotional distress only if he establishes that (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress. *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 702 (7th Cir.1993) (quoting *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (Ill.1988)). Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency.…" *Id.* at 702–03 (quoting *Public Fin. Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (Ill.1976)). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not amount to extreme and outrageous conduct, nor does conduct "characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Public Fin. Corp.,* 4 Ill.Dec. at 654, 360 N.E.2d at 767. Moreover, we judge whether conduct is extreme and outrageous on an objective standard based on all the facts and circumstances of a particular case. *Harriston,* 992 F.2d at 703; *McGrath,* 127 Ill.Dec. at 729, 533 N.E.2d at 811. Thus, to serve as a basis for recovery, the defendant's conduct must be such that the "recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!' " *Doe v. Calumet City,* 161 Ill.2d 374, 204 Ill.Dec. 274, 283, 641 N.E.2d 498, 507 (Ill.1994) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

In the employment context, Illinois courts have recognized that personality conflicts and questioning of job performance are "unavoidable aspects of employment" and that "frequently, they produce concern and distress." *Heying v. Simonaitis,* 126 Ill.App.3d 157, 81 Ill.Dec. 335, 342, 466 N.E.2d 1137, 1144 (1984). The courts have reasoned, how-

ever, that if such incidents were actionable, nearly all employees would have a cause of action for intentional infliction of emotional distress. 81 Ill.Dec. at 342, 466 N.E.2d at 1144. Thus, Illinois courts have limited recovery to cases in which the employer's conduct has been truly egregious. *See, e.g., Pavilon v. Kaferly,* 204 Ill.App.3d 235, 149 Ill.Dec. 549, 555–56, 561 N.E.2d 1245, 1251–52 (1990) (the employer, knowing that the plaintiff was susceptible to emotional distress, offered her money for sexual favors, fired her after she refused, and after he fired her, threatened to kill her, to rape her, and to file a legal action challenging her rights to custody of her child and attempted to disrupt her new employment relationship); *Milton v. Illinois Bell Tel. Co.,* 101 Ill.App.3d 75, 56 Ill.Dec. 497, 501, 427 N.E.2d 829, 833 (1981) (the employer engaged in an extensive course of disciplinary and harassing conduct to coerce the plaintiff to falsify work reports).

In contrast, Illinois courts have denied recovery for distress resulting from recognizably reprehensible conduct which has been linked to an employer's legitimate interest. For example, in *Lundy v. Calumet City,* 209 Ill.App.3d 790, 153 Ill.Dec. 874, 876, 567 N.E.2d 1101, 1103 (1991), an Illinois appellate court held that the plaintiffs, several police officers, who were suspended after their psychological test results indicated that the tests were indeterminate, failed to state a claim for intentional infliction of emotional distress. In *Lundy,* the plaintiffs alleged that their supervisor stripped them of their badges and guns, made public statements asserting that they had either manipulated the tests or were suffering from mental illness, cloaked those statements as official findings in an official order, and purposefully sent the order to the plaintiffs unsealed, uncovered and publicly through other officers. 153 Ill.Dec. at 876, 567 N.E.2d at 1103. In dismissing the complaint, the court emphasized the supervisor's legitimate interest in assuring the mental stability of his officers and explained that while a legitimate interest does not give an employer carte blanche to pursue that interest through any means, the fact that an employer's conduct might cause an employee embarrassment or distress will not convert otherwise unactionable insults or indignities

such as the ones that the plaintiffs suffered into the extreme and outrageous conduct necessary for recovery. 153 Ill.Dec. at 876–77, 567 N.E.2d at 1104–03. Likewise, in *Harris v. First Fed. Sav. & Loan Ass'n of Chicago,* 129 Ill.App.3d 978, 85 Ill.Dec. 89, 90–92, 473 N.E.2d 457, 458–60 (1984), an Illinois appellate court held that a plaintiff who alleged that her employer criticized, demoted, and discharged her after she reported allegedly criminal activity to her supervisor did not state a claim because she did not allege that her employer engaged in this course of conduct to coerce her into engaging in illegal activity. While the court characterized the employer's conduct as "reprehensible," the court held that it did not rise to the level of extreme and outrageous conduct because the employer merely acted out of displeasure with the plaintiff's exercise of judgment regarding another employee's conduct. 85 Ill.Dec. at 92, 473 N.E.2d at 460.

Recognizing this high threshold, this Court and other federal courts applying Illinois law have denied recovery to plaintiffs who alleged that their employers subjected them to a continuous series of intentionally discriminatory acts. For example, in *Harriston,* 992 F.2d at 703, we held that the plaintiff failed to allege conduct that rose to the level of extreme and outrageous conduct even though she contended that among other things her employer refused to allow her to supervise white subordinates, reprimanded her for no reason, refused to allow her to participate in a management incentive fund, forced her out of her management position, promised her a promotion she never received, took away from her major accounts and gave her less lucrative accounts in return, excluded her from office activities, monitored her telephone calls with an eavesdropping device and ignored concerns for her health and safety after her personal property was damaged on company property. *Id; see also Briggs v. North Shore Sanitary Dist.,* 914 F.Supp. 245, 252 (N.D.Ill.1996) (allegations that the plaintiff's employer and fellow employees hung a pickaninny doll in her office, subjected her to racial slurs, excluded her from office social activities, placed her on probation and refused to train her properly did not rise to the

level of extreme and outrageous conduct while allegations that co-workers exposed her to toxic fumes for more than eight hours did).

■ In this case, Van Stan maintains that viewing the evidence in the light most favorable to him, a reasonable jury could have found that Walters and other Fancy Colours supervisors knew that Van Stan suffered from a bipolar disorder, that Fancy Colours fired Van Stan because his disorder required him to work less hours, that Walters telephoned Van Stan at home while he was on vacation to inform him that he had been terminated and that after Van Stan requested an explanation, Walters falsely told Van Stan that he was being fired for low productivity. While we do not mean to condone such conduct, we do not believe that this course of conduct was akin to the type of egregious conduct present in *Pavilon* and *Milton*, nor do we believe that it exceeded all possible bounds of decency. Thus, as a matter of law Fancy Colours' conduct did not rise to the level of extreme and outrageous conduct, and Fancy Colours is entitled to a judgment in its favor.

■ Van Stan maintains that even if we ordinarily might not consider Fancy Colours' conduct extreme and outrageous, we should consider it extreme and outrageous in this case because Fancy Colours knew Van Stan was peculiarly susceptible to emotional harm. Van Stan argues that where a defendant knows that a plaintiff is susceptible to emotional distress, we determine extreme and outrageous conduct on a subjective standard. Thus, he reasons that we must determine whether a person with a bipolar disorder would consider Fancy Colours' conduct extreme and outrageous rather than whether a reasonable person would consider its conduct extreme and outrageous. Van Stan's argument misconstrues the significance of Fancy Colours' alleged knowledge of his mental illness. A defendant's awareness that a plaintiff is susceptible to emotional distress is certainly a factor in determining whether conduct is extreme and outrageous. *McGrath*, 127 Ill.Dec. at 729, 533 N.E.2d at 811. However, the defendant's knowledge of the plaintiff's susceptibility does not alter the objective standard by which a court judges

whether conduct is outrageous. *See Doe*, 204 Ill.Dec. at 283, 641 N.E.2d at 507. Rather, a defendant's knowledge merely impacts the objectively reasonable person's reaction to the defendant's conduct. In other words, a reasonable person may consider behavior, which he might otherwise consider merely rude, abrasive or inconsiderate, to be extreme and outrageous if the actor knows that the victim is particularly likely to suffer emotional distress as a result of the conduct. *McGrath*, 127 Ill.Dec. at 729, 533 N.E.2d at 811. Thus, where a defendant knows that a plaintiff is susceptible to emotional distress, we must determine whether an average member of the community would consider the defendant's conduct extreme and outrageous under all of the circumstances of the case, including the defendant's knowledge of the plaintiff's susceptibility. *Doe*, 161 Ill.2d at 392, 204 Ill.Dec. at 283, 641 N.E.2d at 507. Under this standard, even if Fancy Colours' knew about Van Stan's disorder, Fancy Colours' conduct, while highly inappropriate, would not rise to the level of outrageousness necessary for recovery.

Van Stan also argues that *Smith v. Dovenmuehle Mortgage, Inc.*, 859 F.Supp. 1138, 1143–44 (N.D.Ill.1994), supports the jury's verdict in this case. In *Smith*, a district court denied the employer's motion for summary judgment because the parties disputed whether the employer fired the plaintiff because he had AIDS and whether the employer gave a false pretext for firing him. *Id.* However, in *Smith*, the plaintiff offered some evidence which if accepted would have shown not only that the employer lied about its reasons for firing the plaintiff but also that the false reasons it gave for firing him precluded him from finding another job and that the employer knew that its pretextual reasons would preclude him from finding a new job. *Id.* In contrast, in the instant case, a rational jury could not conclude that Fancy Colours gave low productivity as a false reason for firing Van Stan because it knew that that pretextual reason would preclude Van Stan from finding new employment. Indeed, the testimony at trial revealed that Fancy Colours assisted Van Stan in locating new employment and provided a favorable refer-

ence for him. Thus, Fancy Colours' conduct does not rise to the same level of outrageousness as the employer in *Smith*'s conduct.

## B. Van Stan's Appeal

The district court permitted Fancy Colours to cross-examine Van Stan's expert witness, who is also Van Stan's treating physician, about whether marijuana use would affect the effectiveness of the medication he prescribed for Van Stan. Specifically, the court permitted the witness to answer the question: "Would the use of marijuana by a patient like Mike Van Stan, particularly, have an effect upon the effectiveness of the drugs that you prescribed?" Van Stan contends that the district court improperly permitted the witness to answer this question and that, therefore, he is entitled to a new trial on his ADA claim.

A party seeking a new trial on the basis of evidentiary errors faces a heavy burden because we give special deference to the trial court's evidentiary rulings. *Berry v. Deloney*, 28 F.3d 604, 607 (7th Cir.1994). To this end, we will not find error unless the court's decision is based on an erroneous conclusion of law or the record contains no evidence on which the court rationally could have based its decision or the supposed facts which the court found are clearly erroneous. *Finchum v. Ford Motor Co.*, 57 F.3d 526, 530 (7th Cir.1995). Furthermore, we limit our review of evidentiary errors to those errors which affect a party's substantial rights. *Id.* Evidentiary errors affect substantial rights only when a significant chance exists that they affected the outcome of the trial. *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 685 (7th Cir.1995).

A plaintiff cannot recover under the ADA if through his own fault he fails to control an otherwise controllable illness. *See Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995) (plaintiff's failure to monitor and control his controllable diabetes barred recovery under the ADA). Thus, proof that Van Stan's medication would have controlled his disorder but for his alleged drug-use would be probative and questions concerning the effect of drug-use on the effectiveness of Van Stan's medication would

be relevant. Van Stan maintains, however, that the court should have disallowed the question because Fancy Colours did not preserve Van Stan's alleged drug-use as an issue for trial in the pre-trial order. Pretrial orders establish the issues to be considered at trial. *Erff v. MarkHon Indus., Inc.*, 781 F.2d 613, 617 (7th Cir.1986). Thus, the district court may exclude proof relevant to a theory of recovery or an issue of fact which the parties have not raised in the pretrial order. *Todd v. Corporate Life Ins. Co.*, 945 F.2d 204, 209 (7th Cir.1991); *Erff*, 781 F.2d at 618.

Fancy Colours contends that it raised the issue in paragraph 9 of the pretrial order's contested issues of fact. Paragraph 9 lists as a contested issue: "Whether the medication and treatment changes prescribed by Mr. Van Stan's new psychiatrist, Dr. Leo Jacobs, for his bipolar disorder on November 23, 1993, April 8, 1994, and May 13, 1994, affected Mr. Van Stan's job performance." (Pretrial Order Ex. B–1 para. 9). This paragraph arguably encompasses the issue of whether Van Stan's medication controlled his disorder so that it would not affect his job performance and, consequently, whether any factors within Van Stan's control, may have prevented the medication from controlling his disorder. Thus, Fancy Colours could have offered proof that Van Stan failed to take ordinary measures such as taking the proper dosage to ensure his medication's effectiveness. However, questions relating to drug use—which is illegal and socially unacceptable behavior—raise issues apart from whether Van Stan prevented his medication from controlling his disorder and are more likely to prejudice a jury than questions relating to more ordinary measures for ensuring a medication's effectiveness. Thus, paragraph 9 did not afford Van Stan the time or opportunity to prepare a response to the question at issue, and Fancy Colours' conduct in spontaneously raising the issue at trial resulted in the type of unfair surprise which pretrial orders seek to prevent. 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 1522, 1526 (1990). Accordingly, the drug-use question fell outside of the

scope of the issues of fact preserved for trial, and the district court properly could have excluded the question.

 Because the district court could have excluded the question does not necessarily mean it abused its discretion by not excluding it. *Kuba v. Ristow Trucking Co.*, 811 F.2d 1053, 1055 (7th Cir.1987). In this case, as the court noted, Fancy Colours had posed the question in front of the jury before Van Stan could object. Once Van Stan objected, the district court held a lengthy sidebar conference at which the court clearly considered the options available to it to remedy any prejudice resulting from the question. The court concluded that because Fancy Colours had put the issue in front of the jury already, sustaining Van Stan's objection and striking the question would cause more harm to Van Stan than merely permitting the expert to answer the question. The court reasoned that permitting the witness to answer would make the question seem "routine," and, consequently, that it would be less likely to stand out in the jurors' minds. Moreover, the question which the expert actually answered was clearly a hypothetical question, distancing Van Stan from any allegations of drug use. More importantly, after Van Stan's expert answered the hypothetical question, the court instructed the jury that the expert's answer was not evidence that Van Stan had used marijuana and that the jury was not to consider it as evidence of such. Under these circumstances, we do not believe that the district court abused its discretion in permitting Van Stan's expert to answer the improper question.

 Even if the district court had erred in allowing the question and answer, the error would not require reversal. As we stated above, evidentiary errors require reversal only if a significant chance exists that they affected the outcome at trial. Van Stan contends that the question and answer must have affected the outcome of the case because the manifest weight of the evidence supported a finding in his favor on the ADA claim. He points to the jury's verdict for him on his intentional infliction of emotional distress claim as proof that the evidence weighed in favor of him on the ADA claim.

He reasons that in finding in his favor on the intentional infliction of emotional distress count, the jury must have concluded that Fancy Colours knew about his disability and fired him because of it.

We disagree. Different elements make up a claim under the ADA and a claim for intentional infliction of emotional distress. Thus, the jury's verdict in favor of Van Stan on his emotional distress claim is not per se inconsistent with its finding that Fancy Colours had not violated the ADA. Contrary to Van Stan's assertions, even if the jury concluded that Fancy Colours had fired Van Stan because he requested that his workload be reduced and that Fancy Colours had lied to him about its reasons for firing him, that would not compel the jury to find in his favor on the ADA claim. Instead, the jury could have concluded that Van Stan failed to establish other elements of his claim. For example, based on the evidence presented at trial, a reasonable jury could have concluded that Van Stan was not disabled within the meaning of the ADA. Both Van Stan and his expert testified that Van Stan's disorder did not affect his ability to perform his duties as a warehouse manager. Likewise, both testified that the disorder did not affect his ability to walk, talk, see, hear, speak or communicate. Thus, a reasonable jury could have concluded that Van Stan's disorder did not substantially limit a major life activity and, hence, that Van Stan was not disabled. *Mackie v. Runyon*, 804 F.Supp. 1508, 1510–11 (M.D.Fla.1992) (plaintiff who controlled her bipolar disorder with medication was not handicapped under the Rehabilitation Act because her disorder did not limit her major life activities).

Likewise, a reasonable jury could have concluded that Fancy Colours had not violated the ADA because Walters, the person at Fancy Colours who made the decision to terminate Van Stan, did not know about Van Stan's disorder. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir.1995) (holding an employer cannot be liable under the ADA for firing an employee because of the effects of a disability when the decision maker has no knowledge of the disability and the effects have no obvious link to the dis-

ability). Van Stan presented no direct evidence establishing that Walters was aware of Van Stan's disorder when he decided to fire Van Stan. Instead, Van Stan testified that he told Feltes about his disorder when he was initially diagnosed in 1991, and several Fancy Colours employees testified that they knew Van Stan had a "chemical imbalance." However, no one testified that they told Walters about Van Stan's disability. Moreover, although Walters testified that Van Stan gave him the doctor's note recommending that his hours be reduced to 50 hours per week, the note did not indicate the reason for the recommendation or the condition that the doctor was treating, and it did not indicate that the doctor was a mental health care professional. Contrary to Van Stan's argument, this evidence does not reasonably support the inference that Walters knew about Van Stan's disorder. *Hedberg*, 47 F.3d at 933 (unreasonable to infer that the decision maker knew about the plaintiff's disability because an intermediary supervisor below the decision maker and the company doctor knew about the disability). Therefore, a reasonable jury could have found in favor of Van Stan on his claim for intentional infliction of emotional distress, while finding against him on his ADA claim.

As we stated above, the district court gave the jury a clear limiting instruction, directing the jury not to consider the challenged question and answer as evidence that Van Stan used marijuana. In light of this limiting instruction and the consistent verdicts, we cannot say that the allegedly improper drug-use question affected the outcome of the trial. Any error in allowing the question and answer was harmless.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's entry of judgment in favor of Fancy Colours on Van Stan's ADA claim. However, we REVERSE the district court's order denying Fancy Colours' motion for judgment as a matter of law and REMAND the case to the district court with directions to enter judgment as a matter of law in favor of

Fancy Colours on Van Stan's claim for intentional infliction of emotional distress.