In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2436

MARY R. RICHARDS,

*Plaintiff-Appellant,*

*v.*

U.S. STEEL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:15-cv-00646 — **J. Phil Gilbert**, *Judge.*

ARGUED DECEMBER 9, 2016 — DECIDED AUGUST 28, 2017

Before WILLIAMS and HAMILTON, *Circuit Judges*, and
CHANG, *District Judge*.*

CHANG, *District Judge*. Mary Richards filed this lawsuit
against her employer, U.S. Steel. As the case comes to us, all
that remains is an Illinois state-law claim for intentional in-

_____

*Of the Northern District of Illinois, sitting by designation.

fliction of emotional distress. On that claim, the district court entered summary judgment against Richards on the ground that it is preempted by the Illinois Human Rights Act, 775 ILCS 5/8-111(D). Although our analysis of the preemption issue differs from the district court's take on it, we agree that the emotional-distress claim fails as a matter of law. U.S. Steel can be held responsible for only a subset of the factual allegations that Richard relies on, and on that set of facts, U.S. Steel did not engage in "extreme and outrageous" behavior under Illinois common law. We thus affirm the entry of summary judgment against plaintiff on her emotional-distress claim.

## I. Background

### A. Facts

Because the district court granted summary judgment to U.S. Steel, we recite the facts in the light most favorable to Richards. Richards was hired by National Steel Corporation in 1995, and she continued to work for the company following its sale to U.S. Steel in 2003. At some point in 2009 or early 2010, Richards did a four-month rotation as a "learner electrician" in a department supervised by Daniel Harris. R. 29–8, Harris Dep. at 6. During that rotation, Richards told Harris that she wanted to be the best electrician she could be. Harris Dep. at 11. But in response, Harris told Richards that she would never be able to meet his standards. *Id.*

After the learner-electrician stint, Richards moved on to different department, namely, the Basic Oxygen Furnace De-

partment, where she worked from April 2010 to January 2011. R. 29–1, Richards Dep. at 15, 28. There, Jesse Byrd was one of her supervisors. R. 29–3, Byrd Dep. at 11. Richards had several negative experiences—most involving Byrd—during the nine months that she worked in the Furnace Department.

For example, on her first day at the Furnace Department, Richards met with Byrd in his office. Richards Dep. at 36. During this meeting, Byrd asked Richards whether she could draw a motor circuit and what she had learned in blueprint class. *Id.* at 36–37. Richards was the only learner electrician to be asked those questions. Richards Dep. at 37–38. In May 2010 (the month after she started in the Furnace Department), Richards lost a work glove. Richards Dep. at 45–46. On her break, she approached Byrd, who was talking to four or five men at the time, and she asked for a new pair of gloves. *Id.* at 45–46. In response, Byrd asked her if she wanted one glove or two—and then made a comment about incompetent people. Richards Dep. at 46.

In June 2010, Richards had another encounter with Byrd. Richards was walking from a patio back to the work area when Byrd approached her, jerked her jacket open, and said "I like that" while staring at her. Richards Dep. at 38–39. Richards was shocked and scared, so she "got the hell away from" Byrd. Richards Dep. at 39.

Around three months later, one of Richards's coworkers succumbed to heat exhaustion. Richards took that coworker to the break room, called 911, and started to administer first aid. Richards Dep. at 87. When Byrd showed up, Richards offered to retrieve her and her coworker's tools from the job

site, but Byrd went "b[ers]erk" and told her to stay put. Richards Dep. at 88. After around 30 minutes, Richards left the break room to go back to the job site to "see what was going on," and she ran into Byrd. *Id.* Richards just asked Byrd if it was ok for her to retrieve the tools, but Byrd "screamed at [her] again," so she walked away, returned to the break room, and sat down at a table. *Id.* at 89. Byrd walked in, towered over Richards, and told her to tell him that her boss (which was him) was a prick. *Id.* Byrd then stood behind Richards and said "[m]atter of fact, tell your boss he's a prick." *Id.* Richards replied, "I don't have to, you already did." *Id.*

Later that same day, Richards was in the breakroom when Area Manager Lowery McBride (Byrd's supervisor) came into the room. Richards Dep. at 206. Without saying anything, McBride grabbed Richards's radio off of her chest to make a call. *Id.* at 207. The radio had been hooked to Richards's bra. *Id*.

Toward the end of December 2010, Richards had several more run-ins with Byrd. In one incident, Richards had to stand on a bucket in order to reach some screws that she needed to fix a light. Richards Dep. at 43. Byrd saw her doing this and said, "You think that bucket will hold all that?" Richards' Dep. at 43. Two other electricians were in the room. Richards Dep. at 43. In this same time period, Richards and several coworkers were gathered in the break room when Byrd came in and told a sexual joke. Richards Dep. at 92.

Then, on December 31, 2010, Byrd asked Richards to call a coworker and ask that coworker if he would work over-

time. Richards Dep. at 68–69. During the call, the coworker asked Richards if she could work the overtime instead. Richards Dep. at 69. When Byrd heard this he told Richards to get off the phone and said "[b]efore I let you work the overtime, I'll jump off the bridge." Richards Dep. at 69. Richards retorted, "I'll take you to the bridge." *Id.* Richards ended up working the overtime shift, and Byrd placed her on trash detail (though Richards's coworker ended up taking out most of the trash, Richards Dep. at 112).

During Richards's nine months in the Furnace Department, Byrd also (1) criticized her in front of her coworkers for putting a box on the floor instead of on a shelf; (2) asked Richards if she was listening to him and said "[w]hat, are you scared of me?"; (3) threatened to fire Richards after she called him for help with a unit breakdown; and (4) ominously told her that she was sitting in a chair where a coworker had sat when he was fired. According to Richards, Byrd also would not give her the tools she needed to do her job, despite providing tools to other Department employees. Richards Dep. at 15. When asked for specifics during her deposition, however, Richards remembered only two instances. Once, Richards asked for two stick rulers—one for her and one for her coworker—but she received only one, which she gave to her coworker. Richards Dep. at 24, 32–33. The second time, Richards was out of the office on leave, and Byrd gave everyone in the Furnace Department a flashlight as a Christmas gift. *Id.* at 26. When Richards returned from leave, Byrd did not have a flashlight for her. *Id.* at 26.

Richards left the Furnace Department on January 9, 2011 and began working for the Maintenance Services Department. After she left, Byrd followed her and attempted to

speak with her twice. Richards Dep. at 157, 159. Richards does not know what Byrd tried to say to her because she "just ran away from him." Richards Dep. at 159.

On January 28, 2011, Richards filed a discrimination complaint with U.S. Steel about some of Byrd's conduct. Richards Dep. at 279. Shortly thereafter, human resources personnel Lydia Kachigan and Nic Krasucki met with Richards and her union representatives to discuss the complaint. At that meeting, Kachigan speculated that Byrd had opened Richards's jacket to look at an inside pocket, and told Richards that she needed to adjust to Byrd's rough management style.

A couple of weeks later, on February 12, 2011, feeling like Kachigan had not adequately addressed her concerns, Richards called an U.S. Steel employee hotline to report inappropriate comments made by Byrd, as well as the jacket incident. Richards Dep. at 54, 60. A few days later, Richards met with human resources personnel Mark Tade and David Coombes to address this phone call. When Tade asked Richards about the jacket incident, she became upset and started crying. Tade told Richards she was too emotional and should see a psychiatrist. *Id.*

Several months later, while working for the Maintenance Services Department, Richards failed to show up or call off for an overtime shift that she was scheduled to work. Richards Dep. at 248, 250. Richards was suspended, pending a hearing, for her failure to call off. Following that hearing, her suspension was converted to a discharge. Richards Dep. at 252, 254. After an arbitration, the discharge was overturned.

Richards was evaluated by a psychologist in 2013. R. 29–5, Jewell Report. The psychologist diagnosed Richards with Post-traumatic Stress Disorder and Dysthymic Disorder. Jewell Report at 5. He noted that "the symptoms of these disorders seem to have appeared as a result of [the] traumatic experiences [Richards] encountered while on the job" at U.S. Steel. *Id.*

## B. Procedural History

Initially, Richards filed a three-count complaint in the U.S. District Court for the Southern District of Illinois in November 2012. R. 26–1, *Richards I* Complaint. The complaint alleged (1) retaliation, (2) sexual harassment, and (3) the intentional infliction of emotional distress. *Id.* U.S. Steel filed a motion for summary judgment, asserting that the retaliation and sexual harassment claims were time-barred and that Richards had failed to state a claim for intentional infliction of emotional distress. *Richards I*, 2015 WL 1598081, at *8, *10. The district court dismissed the retaliation and sexual harassment claims as time-barred. *Id.* at *10. The district court held that Richards had stated a claim for intentional infliction of emotional distress, but with the federal-law claims dismissed, the court declined to exercise supplemental jurisdiction over the remaining claim. *Id.* at 11.

Richards refiled her intentional infliction of emotional distress claim in the Circuit Court of Madison County on May 1, 2015. R. 1–1, *Richards II* Complaint. U.S. Steel removed the case—on the basis of diversity jurisdiction—to the U.S. District Court for the Southern District of Illinois.

U.S. Steel then filed another motion for summary judgment, this time asserting three grounds for the dismissal of Richard's emotional-distress claim: (1) Illinois Human Rights Act preemption, (2) untimeliness, and (3) failure to state a claim. *See* R. 26, U.S. Steel SJ Mot. U.S. Steel also argued that it could not be held vicariously liable for some of the conduct that Richards is claiming caused her severe emotional distress. *Id.* at 18 n.8. The district court granted U.S. Steel's summary judgment motion and dismissed the claim for intentional infliction of emotional distress on the ground that it is preempted by the Human Rights Act. *Richards v. U.S. Steel*, No. 15-cv-00646-JPG-SCW, 2016 WL 2755003, at *3 (S.D. Ill. May 12, 2016) (*Richards II*). The district court held that the emotional-distress claim is preempted because it is "'inextricably linked' to her claims of retaliation and sexual harassment." *Id.* at *2; *see also id.* ("[A] review of the complaint indicates that all the allegations relate to a hostile work environment and retaliatory discharge."). Richards appeals from the grant of summary judgment in U.S. Steel's favor.

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*, construing all facts and reasonable inferences in the non-moving party's favor. *Melton v. Tippecanoe Cnty.*, 838 F.3d 814, 818 (7th Cir. 2016). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And there may be more than one basis to affirm the entry of summary judgment: "[w]e can affirm on any ground supported by the record so long as

the issue was raised and the non-moving party had a fair opportunity to contest the issue in the district court." *Locke v. Haessig*, 788 F.3d 662, 666 (7th Cir. 2015).

### III. Preemption under the Illinois Human Rights Act

In this appeal, Richards argues that the Illinois Human Rights Act does not preempt her common law claim for intentional infliction of emotional distress. The statutory source of preemption is Section 8-111(D) of the Act: "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the *subject* of an alleged *civil rights violation* other than as set forth in this Act." 775 ILCS 5/8-111(D) (emphases added).[1] That statutory provision tells us that the "subject" of an alleged "civil rights violation" must be heard under the procedures of the Act.

In the context of employment cases, the Human Rights Act defines "civil rights violation" to include sex discrimination in employment. Specifically, it is a civil rights violation "[f]or any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination," 775 ILCS 5/2-102(A), which includes discrimination against a person because of her sex, *see id.* § 1–103(Q). The Act also

---

[1] The preemption provision was previously designated as subparagraph (C) of Section 8-111, so earlier opinions refer to the provision as Section 8-111(C) instead of Section 8-111(D). The redesignation was effective on January 1, 2008. *See* Ill. Public Act 95–243, § 5.

specifically bans sexual harassment in employment: it is a civil rights violation for "any employer, employee, agent of any employer, employment agency or labor agency to engage in sexual harassment." 775 ILCS 5/2-102(D). Sexual harassment in turn is defined as "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when … such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." *Id.* § 2–101(E). Finally, it is a civil rights violation to retaliate against an employee for complaining about either sexual harassment or unlawful discrimination. 775 ILCS 5/6-101(A).

With those statutory definitions of "civil rights violations," it is easy in some instances to figure out that a common-law claim is, in actuality, the "subject" of a "civil rights violation" under the Act, 775 ILCS 5/8-111(D), and is thus preempted. For example, if an employer refused to hire a job applicant on a prohibited basis, such as race or sex, 775 ILCS 5/1-103(Q), then that would be a civil rights violation under the Act and would not comprise the elements of an emotional-distress claim (we discuss those elements in more detail later). To be sure, that sort of discriminatory hiring practice would be illegal under the Act (not to mention under federal law, in most circumstances), but is not the sort of egregious conduct that Illinois courts have deemed to qualify as intentional infliction of emotional distress. So the unsuccessful job applicant could not pursue the claim of discrimination under the guise of the common-law tort of intentional infliction of emotional distress.

But misconduct that arises in the employment context might still form the basis for a sustainable common-law tort under Illinois law. It is true that, in past cases, we have characterized Section 8-111(D) as a "preemption" provision, *e.g.*, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 602 (7th Cir. 2006)—and indeed that statutory provision does require that the "subject" of a "civil rights action" be brought only under the Human Rights Act. But the Act does *not* call for preemption in the broader sense that all claims *arising* out of an employment relationship are precluded. That sort of preemption is sometimes found in federal statutes that block state-law claims relating to, or arising from, an entire category of conduct or an entire category of injury. *E.g.*, *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1428 (2014) (discussing scope of federal statute that preempts state laws "related to" the "price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1)); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 230 (2011) (discussing scope of federal statute that preempts state-law claims for damages "arising" "from a vaccine-related injury," 42 U.S.C. § 300aa–22(b)(1)).

In contrast, the Human Rights Act's preemption provision is narrower. As the Illinois Supreme Court explained in concluding that common-law claims may be based on some workplace misconduct:

> The adjudication of tort claims has traditionally been within the province of our courts, and we can find nothing in the language of the Act, or the policy underlying it, which indicates that the legislature intended to preclude … court[s] from exercising jurisdiction

> over all tort claims related to incidents of sexu-
> al harassment.

*Maksimovic v. Tsogalis*, 687 N.E.2d 21, 24 (Ill. 1997). To draw the line between preemption versus not, the Illinois Supreme Court has boiled down the inquiry as follows: whether a court "may exercise jurisdiction over a tort claim depends on whether the tort claim is inextricably linked to a civil rights violation such that there is no *independent* basis for the action apart from the Act itself." *Id.* at 23 (emphasis added). Put another way, the key to preemption is not whether the facts that support a common law tort claim (like intentional inflic-tion of emotional distress) would also support a claim under the Human Rights Act, but rather whether the plaintiff can prove the elements of the tort "*independent* of any legal du-ties created by the Illinois Human Rights Act." *Id.* at 24 (em-phasis added); *see also Geise v. Phoenix Co.*, 639 N.E.2d 1273, 1277 (Ill. 1994) (on facts of that case, sexual harassment claim preempted because "no independent basis" for common-law claim); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 602–03 (7th Cir. 2006) ("if a plaintiff can allege facts sufficient to establish elements of a tort, that tort is not preempted" by the Act). So, although Illinois case law at times refers to broad-concept formulations of the test, such as whether the claims are "in-extricably linked," or "in essence" one and the same, *Maksi-movic*, 687 N.E.2d at 23, the concrete question to ask is whether the plaintiff states a valid common-law claim with-out needing to rely on the rights and duties created by the Human Rights Act, *id.* at 24; *Geise*, 639 N.E.2d at 1277; *Naeem*,

444 F.3d at 602–03.[2] Following the Illinois Supreme Court, we too have emphasized that the preemption test "rest[s] on an examination of legal duties, not on the factual" overlap between the claims. *Naeem*, 444 F.3d at 603 n.4. Applied here, the factual overlap between Richards's statutory and emotional-distress claim does not matter, so she can pursue tort claims free of statutory preemption—as long as she does not rely on rights or duties created by the Human Rights Act.

## IV. Analysis of the Emotional-Distress Claim

### A. Respondeat Superior

In this case, when we ask whether Richards can state a valid common-law claim without needing to rely on rights or duties sourced to the Human Rights Act, our answer is no. Disarmed of the Human Rights Act, Richards faces insurmountable factual and legal hurdles. First, the set of facts—that is, the alleged misconduct—on which Richards can rely in asserting the emotional-distress claim is restricted only to those that the Illinois *common law* would attribute to

---

[2] It is worth noting that, in resolving U.S. Steel's summary judgment motion, the district court order referred to the "inextricably linked" formulation as if it were primarily a factual-overlap test, and the order quoted at length from *Jansen v. Packaging Corp. of America*, 123 F.3d 490, 493 (7th Cir. 1997). *Richards*, 2016 WL 2755003, at *2–3. But *Jansen* was decided a couple of months before *Maksimovic*, in which the Illinois Supreme Court made clear that the preemption-or-not test is simply whether the plaintiff has established the elements of her tort claim independent of any duties supplied by the Human Rights Act, and rejected a factual-relatedness test. *Maksimovic*, 687 N.E.2d at 23–24.

U.S. Steel. Although the Human Rights Act imposes strict liability on an employer for a supervisor's misconduct, not so with the common law. *Geise*, 639 N.E.2d at 1277 (under the common law, "[a]bsent the allegations of sexual harassment, Geise would have no independent basis for imposing liability on her former employer under the facts present here"); *id.* ("the Act imposes strict liability on the employer"). [3] Under Illinois common law, an "employer may be held vicariously liable for the tort of an employee if the tort is committed within the scope of the employment." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016). Illinois courts look to the criteria identified in Section 228 of the Restatement (Second) of Agency to determine whether an employee's conduct is within the scope of employment:

> (1) Conduct of servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;

---

[3] In the district court, U.S. Steel raised this issue in a footnote, *see* U.S. Steel SJ Mot. at 18 n.8, and did so again on appeal, Appellee's Br. at 11 n.7. We often find that arguments in footnotes are insufficiently developed, but here U.S. Steel actually cited pertinent case law, and also it was Richards's burden, as the plaintiff, to establish in the first instance that U.S. Steel could be held liable for the alleged misconduct. *See Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007) (to apply respondeat superior, plaintiff has the burden to show that an employee's tortious conduct was within the scope of employment). Yet Richards's briefing (both in the district court and on appeal) made no meaningful effort to do so.

(c) it is actuated, at least in part, by a pur-
pose to serve the master, and

(d) if force is intentionally used by the serv-
ant against another, the use of force is not
unexpectable by the master.

(2) Conduct of a servant is not within the scope
of employment if it is different in kind from
that authorized, far beyond the authorized
time or space limits, or too little actuated by a
purpose to serve the master.

Restatement (Second) of Agency § 228 (1958) (cited by *Bagent
v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007)). In keep-
ing with Section 228, an employer is not liable for the acts of
an employee where the acts complained of were committed
solely for the benefit of the employee. *Boston*, 816 F.3d at 467;
*Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996). And
in the specific context of sexual assault, the sexual nature of
the misconduct generally disqualifies the employee's act as
being taken in furtherance of the employer's interest. *Doe ex
rel. Doe v. Lawrence Hall Youth Servs.*, 966 N.E.2d 52, 61 (Ill.
App. Ct. 2012) (collecting cases and holding that "sexual as-
sault *by its very nature* precludes a conclusion that it occurred
within the employee's scope of employment under the doc-
trine of *respondeat superior*") (emphasis in original); *Deloney v.
Bd. of Educ. of Thornton Twp.*, 666 N.E.2d 792, 797–98 (Ill. App.
Ct. 1996). This is so even where the employment provided

the opportunity for the employee to engage in misconduct. *Doe*, 966 N.E.2d at 61–62; *Deloney*, 666 N.E.2d at 788.[4]

Applying these principles to this case, U.S. Steel cannot be held liable for two of the instances of misconduct that Richards has alleged in support of the emotional-distress claim. The first happened in June 2010, when Richards was walking from a patio back to the work area. Jesse Byrd (one of the supervisors in the Furnace Department) approached Richards, jerked her jacket open, and said "I like that" while staring at her. Richards Dep. at 38–39. The second happened in around December 2010. Richards and several coworkers were gathered in the break room when Byrd came in and told an off-color joke (described earlier in this opinion) involving his wife. Richards Dep. at 92. Neither instance, even though offensive in what should be a non-discriminatory workplace, had any apparent relation to Byrd's job duties as a supervisor or could be said to further U.S. Steel's interests. Illinois common law does not reach so far as to attribute Byrd's conduct in those instances to U.S. Steel.

---

[4] If this seems too much of a constraint on imposing liability on employers, remember that the Human Rights Act provides for much broader attribution of misconduct to employers, *Geise*, 639 N.E.2d at 1277, but Richards brought claims under the Act too late. We also emphasize that Richards has not pursued her claims (either in resisting summary judgment in the district court or on appeal) against U.S. Steel under a theory of negligent hiring, supervision, or retention of Byrd or other individuals who mistreated her, *Cf. Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643 (7th Cir. 2017) (predicting that Illinois would recognize a claim against an employer for a supervisor's murder of subordinate where the employer had reason to foresee danger and failed to prevent the misuse of supervisory authority), so we have no occasion to address those theories.

## B. The "Extreme and Outrageous" Element

Moving beyond the narrowing of the facts that Richards can rely on, the second hurdle to successfully asserting a claim for intentional infliction of emotional distress is the high bar set by Illinois case law for that type of claim. Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). In defining the first element, the Illinois Supreme Court has held that "to qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Feltmeier*, 798 N.E.2d at 83. To avoid imposing liability for the rough and tumble of unpleasant—but not law-breaking—behavior, the case law instructs that "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not amount to extreme and outrageous conduct, nor does conduct 'characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (quoting *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)). And to avoid imposing liability for idiosyncratic and individualized reactions, "[w]hether conduct is extreme and outrageous is judged on an objective standard based on all the

facts and circumstances of a particular case." *Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003).

Liability for emotional distress, as a common-law tort, is even more constrained in the employment context. "Illinois courts have limited recovery to cases in which the employer's conduct has been truly egregious." *Van Stan*, 125 F.3d at 568. This is because "personality conflicts and questioning of job performance are unavoidable aspects of employment and … frequently, they produce concern and distress." *Id.* at 567 (internal quotation marks omitted). Indeed, there is general hesitation "to find intentional infliction of emotional distress in the workplace because, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem*, 444 F.3d at 606 (internal quotation marks omitted); *see also Lewis v. School Dist. No. 70*, 523 F.3d 730, 747 (7th Cir. 2008) ("Employers often and necessarily take actions during the course of business that result in emotional distress, but those actions cannot be classified as 'extreme and outrageous' unless they go well beyond the parameters of the typical workplace dispute." (internal quotation marks omitted)). As a result, courts are hesitant to conclude that conduct is extreme and outrageous in the employer-employee context unless an "employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Naeem*, 444 F.3d at 605 (internal quotation marks omitted); *Lewis*, 523 F.3d at 747.

Under those governing legal principles, the misconduct[5] that Richards advances as the premise of the emotional-distress claim does not qualify as "extreme and outrageous," even when viewed in the light most favorable to her. As discussed earlier in the opinion, Jesse Byrd (a supervisor in the Furnace Department) and Daniel Harris (the supervisor in another department), made comments about Richards's lack of workplace competency. Among other things, Byrd also made an insulting remark about Richards's weight and dared Richards to call him an insulting name to his face. And, in one instance, Area Manager Lowery McBride (who was Byrd's supervisor) grabbed a radio off of Richards's chest to make a call. Although none of these instances are a credit to a respectful workplace, none of them, either alone or in combination, amount to "extreme and outrageous"

---

[5] We pause for a moment to comment on the bounds of the set of facts that Richards can rely on. First, it is worth noting again that, as discussed earlier in the opinion, two instances of misconduct cannot be attributed to U.S. Steel under *respondeat superior.* Second, we reject U.S. Steel's argument that Richards is limited to only the three acts that were expressly identified in the *complaint* as comprising the intentional infliction of emotional distress. *See* Compl. ¶ 22; Appellee's Br. at 17. Federal courts are not confined to the factual allegations in a complaint when considering a motion for summary judgment. *See* Fed. R. Civ. P. 56(c). Third (and on the other hand), we do limit the set of facts to the events that Richards actually discussed in her brief on appeal. *See Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002). In other words, in deciding this appeal, we have not considered conduct that Richards herself did not include in her brief, even if other events were mentioned in the pleadings, depositions, or other documents filed with the district court. It is outside the federal judiciary's duty to comb through a lengthy record to divine additional facts that might support an appellant's claim. *Id.*

misconduct under Illinois law. This is especially true given that this all took place in the workplace, where Illinois common law (remember, the Human Rights Act is broader) pays special care to avoid transforming employer-employee disagreements into an emotional-distress claim. *See Naeem*, 444 F.3d at 605. The same goes for the reactions of human resources personnel Lydia Kachigan and Mark Tade, who allegedly made insensitive remarks in response to Richards's complaints about Byrd. By the time Richards met with Kachigan and (separately) Tade, Richards already had left the Furnace Department and Byrd was no longer her supervisor. Nor were the human resources personnel required to believe Richards's version of events. It bears repeating again that the Human Rights Act might very well have dictated a different response by human resources personnel. But it is a different story under Illinois common law, where the bar is set much higher. Richards's emotional-distress claim fails as a matter of law.

## V. Conclusion

Constrained to the alleged misconduct that could possibly be attributed to U.S. Steel, Richards has not established, independent of the Human Rights Act, that U.S. Steel engaged in "extreme and outrageous" behavior under Illinois common law. We thus AFFIRM the district court's entry of summary judgment against the plaintiff on her emotional-distress claim.