In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-3278
DIANE M. TRAHANAS,
 Plaintiff-Appellant,
 v.

NORTHWESTERN UNIVERSITY and
STEVEN J. SCHWULST,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 1:15-cv-11192 — John J. Tharp, Jr., Judge.
 ____________________

 ARGUED SEPTEMBER 20, 2022 — DECIDED APRIL 7, 2023
 ____________________

 Before EASTERBROOK, HAMILTON, and BRENNAN, Circuit
Judges.
 BRENNAN, Circuit Judge. Diane Trahanas worked as a re-
search technician in a medical lab. After almost three years,
she took medical leave and eventually her employment was
terminated. Based on statements made to her by her supervis-
ing doctor and coworkers, she sued her former university em-
ployer and the doctor. She claimed they created a hostile work
2 No. 21-3278

environment in violation of Title VII and retaliated against
her under the Family and Medical Leave Act and the Ameri-
cans with Disability Act. She also alleged that, contrary to Il-
linois law, the defendants defamed her and intentionally
caused her emotional distress. The district court granted sum-
mary judgment to the defendants, which we aﬃrm.
 I.
 A. Factual Background 1
 In June 2012, Trahanas began working as a Research Tech-
nologist II in Dr. Steven Schwulst’s laboratory at the North-
western University Feinberg School of Medicine. She assisted
Schwulst in studying traumatic brain injuries by conducting
research experiments on mice. She also helped prepare and
present research publications about those experiments.
 At times, Trahanas “got along very nicely” with Schwulst.
But starting in the fall of 2012, Trahanas claims Schwulst
started making verbally abusive and demeaning remarks
about her work ethic, mental health, and sexual orientation.
In her deposition, Trahanas said Schwulst called her a “typi-
cal millennial” and “Princess Diana” to imply she was spoiled
or entitled. He also made comments like “Diane is oﬀ her
meds,” “Diane needs psychiatric help,” or “Diane is riding the
struggle bus again.”
 Most frequently, Schwulst commented on what he per-
ceived as Trahanas’s sexual orientation. During a

 1 Because Trahanas appeals from a grant of summary judgment, we

present the facts in the light most favorable to her and draw all inferences
in her favor. Perez v. Staples Cont. & Com. LLC, 31 F.4th 560, 563 n.1 (7th
Cir. 2022).
No. 21-3278 3

conversation about workout routines, Schwulst said women
who exercise too much, like Trahanas, look “manly” and are
“lesbians.” Trahanas said Schwulst regularly referred to her
as such or as a “softball player,” which Trahanas took as a eu-
phemism for a lesbian. He also stated he “hope[d his] baby
girl will be a lesbian like Diane” because it would make life
easier. Trahanas, a heterosexual woman, told Schwulst on
multiple occasions that she was not a lesbian. Trahanas did
not report Schwulst’s remarks to Northwestern’s human re-
sources department or any other administrative employee at
the medical school.
 Trahanas also contends her lab coworkers made harassing
comments to her. Schwulst shared lab space with another re-
search scientist, Dr. Harris Perlman. Perlman’s lab manager,
Rana Saber, would tell Trahanas to “[s]top messing things
up,” blame her for “doing everything wrong,” and implore
her to “take [her] meds.” According to Trahanas, Saber and
another lab coworker intentionally sabotaged a six-month
long research project by giving her an outdated “protocol”
used for cell analysis. Trahanas mentioned the protocol inci-
dent to Schwulst, but she did not report her coworkers’ con-
duct to HR.
 Notwithstanding the lab environment, Trahanas consist-
ently received positive performance reviews from Schwulst.
After around two years in the lab, Trahanas spoke with
Schwulst about receiving a pay raise and a promotion to Re-
search Technologist III. Schwulst was receptive, and he
reached out to the human resources department about that
possibility. HR recommended not changing Trahanas’s title
because her responsibilities remained at the Tech-II level, but
Trahanas did receive a 3% merit pay raise. Believing a mistake
4 No. 21-3278

had been made about her promised promotion, Trahanas con-
tacted HR. She also expressed her frustration to Schwulst,
which prompted him to make additional requests for Tra-
hanas to receive a greater increase in pay. Schwulst notiﬁed
Trahanas that, to secure another raise, he needed to meet with
her for a midyear performance review. Tensions escalated
during that performance review meeting, and Trahanas cried.
Despite the contentious meeting, Trahanas ultimately re-
ceived a 15% pay raise.
 Trahanas also aspired to attend medical school. Based on
her strong work performance, Schwulst wrote a positive rec-
ommendation letter in support of her medical school applica-
tions in October 2014. She applied to 15 medical schools in the
2014–15 application cycle but was accepted to none. Six of
those schools invited her to submit secondary materials, but
she failed to do so by the schools’ deadlines. Trahanas later
applied to 11 medical schools in the 2017–18 cycle, including
four from the 2014 cycle. Again, none of the medical schools
accepted her.
 Trahanas had been diagnosed with attention deﬁcit hyper-
activity disorder, depression, and anxiety in 2007. In the
months leading up to February 2015, she reported worsening
depressive symptoms. Among multiple stressors, her psychi-
atrist noted persistent, high, or increased job stress. Tra-
hanas’s symptoms mildly improved by the start of February
2015. But she told her psychiatrist she planned to take time oﬀ
work because she felt “burnt out.” She did not provide
Schwulst or Northwestern with advance notice of her plans to
take leave.
 On February 16, 2015, Trahanas did not report to work.
She emailed Schwulst a day later to inform him she was
No. 21-3278 5

taking medical leave and would communicate only with the
human resources department. After her psychiatrist submit-
ted supporting paperwork a few days later, a Northwestern
administrator approved Trahanas for twelve weeks of leave
under the Family and Medical Leave Act.
 Schwulst wanted an update on the status of the lab’s cur-
rent mice experiments, so he asked an HR employee to reach
out to Trahanas on his behalf. While awaiting a response,
Schwulst went to ﬁnd the mice and check the status himself.
Believing that Trahanas had started a lab experiment but see-
ing no notations on any lab paperwork about its progress, he
decided to euthanize the mice. That same day, February 19,
Schwulst wrote a letter stating: “I am writing to formally
withdraw my prior letter of reference for Ms. Diane Trahanas.
I can no longer support her candidacy for admission to med-
ical school.” He uploaded the letter to the American Medical
College Application Service (“AMCAS”), where he had
submitted his initial recommendation letter for Trahanas. The
following day, Trahanas responded to the human resources
department and indicated she had lost remote access to her
work computer.
 Trahanas’s leave expired in May 2015. She requested
Northwestern’s leave administrator to close her leave claim in
June, but she did not return to the lab. HR asked Trahanas if
she intended to resign or extend her leave. If the latter, North-
western needed additional documentation from her doctor.
The university further informed Trahanas that failure to re-
turn to work or extend her leave would result in termination.
Trahanas responded that her doctor was “not allowing [her]
to return to work,” but she did not extend leave or return to
the lab. Accordingly, Northwestern terminated her
6 No. 21-3278

employment. Trahanas applied for other jobs at Northwest-
ern over the next several months. She received one interview
but was not hired.
 B. Procedural Background
 In 2015, Trahanas sued Northwestern and Schwulst. She
brought a hostile work environment claim under Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and a
retaliation claim under the Americans with Disabilities Act of
1990 (ADA), 42 U.S.C. § 12101, et seq., against Northwestern.
She also brought a claim for retaliation under the Family and
Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601, et seq.,
against Northwestern and Schwulst. Trahanas additionally
sued both defendants for defamation and intentional inﬂic-
tion of emotional distress under Illinois law.
 In December 2020, the district court granted defendants
summary judgment on all claims except the FMLA retaliation
claim against Schwulst. The court concluded that Northwest-
ern was not liable for creating a hostile work environment
under Title VII for two reasons. First, Trahanas did not expe-
rience an adverse employment action. Second, she failed to
report Schwulst’s and her coworkers’ conduct.
 Trahanas had alleged that Northwestern retaliated against
her for taking FMLA leave in violation of both the FMLA and
ADA. Because she provided insuﬃcient evidence, the court
granted Northwestern summary judgment on both retaliation
claims. Initially, summary judgment was denied for Schwulst
on the FMLA retaliation claim because the court found that a
reasonable jury could conclude that Schwulst was motivated
to withdraw his recommendation letter in part by Trahanas’s
decision to take FMLA leave. The district court also ruled that
No. 21-3278 7

neither Northwestern nor Schwulst defamed Trahanas be-
cause they published no false statements about her. On her
claim of intentional inﬂiction of emotional distress, the court
did not deem the conduct at issue extreme or outrageous.
 After Schwulst moved to reconsider, the district court
granted him summary judgment on the FMLA retaliation
claim in July 2021. The court reasoned that Trahanas had
shown no injury and therefore lacked standing, or in the al-
ternative she could not recover damages compensable under
the FMLA. Trahanas appeals the district court’s grants of
summary judgment to Northwestern and Schwulst. 2
 II. Analysis
 “We review de novo a district court’s grant of summary
judgment, viewing the facts in the light most favorable to the

 2 In her notice of appeal Trahanas wrote that she appealed the orders

“granting summary judgment to Northwestern … on December 23,
2020[,] … and Stephen J Schwulst … on July 8, 2021.” Because Trahanas
did not mention Schwulst in reference to the December 2020 order, North-
western and Schwulst argue she failed to appeal the district court’s grant
of summary judgment in favor of Schwulst on the defamation and emo-
tional distress claims.
 Under Federal Rule of Appellate Procedure 3(c), a notice of appeal
must “designate the judgment—or the appealable order—from which the
appeal is taken.” FED. R. APP. P. 3(c)(1)(B). The rule provides that “[a]n ap-
peal must not be dismissed for informality of form or title of the notice of
appeal, [or] for failure to name a party whose intent to appeal is otherwise
clear from the notice.” FED. R. APP. P. 3(c)(7). Trahanas’s intent to appeal
the entirety of the district court’s dispositive orders granting summary
judgment in favor of the defendants is apparent from the text of her notice.
See, e.g., Cooper v. Retrieval-Masters Creditors Bureau, Inc., 42 F.4th 688, 694
(7th Cir. 2022). We therefore consider all claims resolved in both orders on
appeal.
8 No. 21-3278

non-moving party.” Fin. Fiduciaries, LLC v. Gannett Co., 46
F.4th 654, 668 (7th Cir. 2022) (quoting Ludwig v. United States,
21 F.4th 929, 931 (7th Cir. 2021)). Summary judgment is ap-
propriate when “there is no genuine dispute as to any mate-
rial fact and the movant is entitled to judgment as a matter of
law.” FED. R. CIV. P. 56(a). A genuine issue of material fact ex-
ists when “there is suﬃcient evidence favoring the nonmov-
ing party for a jury to return a verdict for that party.” Brown
v. Osmundson, 38 F.4th 545, 549 (7th Cir. 2022) (quoting Ander-
son v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). But a “mere
existence of a scintilla of evidence in support of the [non-
movant’s] position will be insuﬃcient” to survive summary
judgment. Parker v. Brooks Life Sci., Inc., 39 F.4th 931, 936 (7th
Cir. 2022) (quoting Anderson, 477 U.S. at 252). We address in
order Trahanas’s Title VII hostile work environment claim,
ADA and FMLA retaliation claims, and state law claims.
 A. Hostile Work Environment
 Trahanas alleges Northwestern subjected her to a hostile
work environment in violation of Title VII. Under Title VII,
employers cannot discriminate against employees because of
their “race, color, religion, sex, or national origin.” 42 U.S.C.
§ 2000e-2(a)(1). This prohibition on discrimination also
reaches the creation of a “hostile or abusive work environ-
ment … permeated with discriminatory intimidation, ridi-
cule, and insult.” Alexander v. Casino Queen, Inc., 739 F.3d 972,
982 (7th Cir. 2014). To establish a hostile work environment
claim, a plaintiﬀ must show: (1) the work environment was
both subjectively and objectively oﬀensive; (2) the harassment
was based on membership in a protected class; (3) the conduct
was severe or pervasive; and (4) there is a basis for employer
No. 21-3278 9

liability. Scaife v. U.S. Dep’t of Veterans Aﬀs., 49 F.4th 1109,
1115–16 (7th Cir. 2022) (citing Casino Queen, 739 F.3d at 982)).
 Diﬀerent standards apply in evaluating an employer’s lia-
bility for a hostile work environment, depending on whether
the alleged harasser is the victim’s supervisor or coworker.
Paschall v. Tube Processing Corp., 28 F.4th 805, 813 (7th Cir.
2022). For supervisors, an employer is strictly liable when a
“supervisor’s harassment culminates in a tangible employ-
ment action.” Vance v. Ball State Univ., 570 U.S. 421, 424 (2013).
Absent such action, an employer may raise an aﬃrmative de-
fense to avoid liability. Id. But when the harasser is a
coworker, “the employer is liable only if it was negligent in
controlling working conditions.” Id. We consider Northwest-
ern’s liability for the conduct of Trahanas’s supervisor
Schwulst as well as of her lab coworkers.
 1. Supervisor harassment
 Northwestern’s liability for Schwulst’s conduct hinges on
whether his alleged harassment culminated in a tangible
employment action. A tangible employment action is a “sig-
niﬁcant change in employment status, such as hiring, ﬁring,
failing to promote, reassignment with signiﬁcantly diﬀerent
responsibilities, or a decision causing a signiﬁcant change in
beneﬁts.” Vance, 570 U.S. at 431 (quoting Burlington Indus., Inc.
v. Ellerth, 524 U.S. 742, 761 (1998)).
 Trahanas argues that Schwulst promised her a promotion
but failed to follow the appropriate procedures. To the con-
trary, Schwulst inquired through the proper channels about
promoting Trahanas to a Research Technologist III. Because
her work responsibilities lined up with the Research Tech–II
position, Schwulst was unsuccessful in getting a title change
10 No. 21-3278

approved. But he did succeed in getting Trahanas a 15% pay
increase. While tension surrounded discussions about Tra-
hanas’s title and pay, Schwulst’s conduct did not result in a
tangible employment action.
 Further, Schwulst took no part in Trahanas’s decision to
leave the lab. Following the expiration of her leave, Trahanas
chose not to return to work. She told Northwestern that her
doctor was “not allowing [her] to return to work,” but she did
not extend her leave. In response, Northwestern released her
position. Trahanas’s voluntary decision not to return to work
or extend leave does not amount to a tangible employment
action.
 Because Schwulst’s conduct did not culminate in a tangi-
ble employment action, Northwestern may raise an aﬃrma-
tive defense. Under the Faragher-Ellerth defense 3, an employer
may avoid liability by showing: “(1) it exercised reasonable
care to prevent and correct promptly any sexually harassing
behavior;” and “(2) the plaintiﬀ unreasonably failed to take
advantage of any preventive or corrective opportunities pro-
vided by the employer or to otherwise avoid harm.” Hunt v.
Wal-Mart Stores, Inc., 931 F.3d 624, 628 (7th Cir. 2019) (citing
Ellerth, 524 U.S. at 765).
 On the ﬁrst element, the record shows that Northwestern
exercised reasonable care to prevent sexually harassing be-
havior. “Prevention can involve proactive steps such as

 3 Under this defense, Title VII does not require that employers be held

vicariously liable for a hostile work environment created by a supervisor
unless that environment is accompanied by an adverse employment ac-
tion. Faragher v. City of Boca Raton, 524 U.S. 775, 805–806 (1998); Ellerth, 524
U.S. at 765.
No. 21-3278 11

constructing a reporting system for instances of sexual har-
assment.” Id. at 629; see also Shaw v. AutoZone, Inc., 180 F.3d
806, 811 (7th Cir. 1999) (“While not required as a matter of
law, … the existence of an appropriate anti-harassment policy
will often satisfy this ﬁrst prong.”). The parties agree that
Northwestern maintained a policy prohibiting discrimination
and harassment based on protected legal categories, includ-
ing sex and sexual orientation. The policy, included in its staﬀ
handbook, provided instructions and multiple avenues—in-
cluding those outside an employee’s supervisory chain of
command—for ﬁling complaints. This anti-harassment policy
is suﬃcient to satisfy the ﬁrst prong of the Faragher-Ellerth de-
fense.
 Second, Northwestern has established that Trahanas “un-
reasonably failed to take advantage of any preventive or cor-
rective opportunities provided by the employer or to other-
wise avoid harm.” Hunt, 931 F.3d at 628. Trahanas admitted
that she received Northwestern’s handbook at the start of her
employment. She signed an acknowledgement form, which
stated that the handbook included “policies that every em-
ployee must know regarding … sexual harassment.” That
form provided that Trahanas could reach out to anyone in the
Department of Human Resources with questions about the
handbook’s policies. Whether Trahanas actually read the
handbook is “irrelevant because it is undisputed that she
received a copy of the policy and that she was required as a
condition of her employment to read and comply with [ ] the
policy.” Shaw, 180 F.3d at 811. This amounts to constructive
knowledge of Northwestern’s anti-harassment policy. Id.
 Notwithstanding this knowledge, Trahanas did not report
Schwulst’s comments to HR or any other administrative
12 No. 21-3278

employee. She communicated frequently with administrative
employees about her compensation, job title, and FMLA
leave. But at her deposition she admitted she did not report
Schwulst’s behavior to the human resources department. Tra-
hanas says she feared that Schwulst would retaliate by not
writing her a recommendation letter if she complained. Any
“fear of unpleasantness cannot excuse [Trahanas] from using
the company’s complaint mechanisms.” Montgomery v. Am.
Airlines, Inc., 626 F.3d 382, 391–92 (7th Cir. 2010); Shaw, 180
F.3d at 813 (concluding that “an employee’s subjective fears
of confrontation, unpleasantness or retaliation do not allevi-
ate the employee’s duty under Ellerth to alert the employer to
the allegedly hostile environment”). Trahanas’s failure to
alert Northwestern about the allegedly hostile environment
created by Schwulst establishes the second prong of the Fara-
gher-Ellerth defense. Northwestern has established an aﬃrm-
ative defense and therefore is not liable under Title VII for
Schwulst’s conduct.
 2. Coworker harassment
 Trahanas also argues that her coworkers’ behavior
contributed to creating a hostile work environment. She takes
issue with her coworkers “mocking and ridiculing [her] be-
cause she is under stress and medical care.” For example, Tra-
hanas claims that Saber told Trahanas one time: “dude, take
your meds.” She also points to the incident where Saber and
another lab coworker—both employees in Perlman’s labora-
tory—intentionally sought to sabotage her work by giving her
an outdated protocol for cell analysis.
 Although Trahanas alleges inappropriate behavior by her
coworkers, her allegations do not show that Northwestern is
liable. To start, the inappropriate behavior Trahanas
No. 21-3278 13

highlights on appeal is not based on her “race, color, religion,
sex, or national origin.” 42 U.S.C. § 2000e-2(a)(1). Comments
about her mental health do not give rise to liability under Title
VII. 4
 In addition, Northwestern had no knowledge of any al-
leged coworker harassment. Recall that an employer is liable
for coworker harassment “only when the employee shows
that h[er] employer has been negligent either in discovering
or remedying the harassment.” Paschall, 28 F.4th at 813 (inter-
nal quotation marks omitted). Generally, “[a]n employer’s le-
gal duty in co-employee harassment cases will be discharged
if it takes ‘reasonable steps to discover and rectify acts of [ ]
harassment of its employees.’” Id. (quoting Parkins v. Civ. Con-
structors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998)). But an
employer is not liable “when a mechanism to report the har-
assment exists, but the victim fails to utilize it.” Id. at 816
(quoting Durkin v. City of Chi., 341 F.3d 606, 612–13 (7th Cir.
2003)).
 Northwestern took reasonable steps to discover employee
acts of harassment by implementing an anti-harassment pol-
icy and establishing complaint mechanisms. As with
Schwulst, Trahanas admitted in her deposition that she did
not report her coworkers’ comments or conduct to North-
western. Without knowledge of what Trahanas’s coworkers
were doing, Northwestern cannot be held liable for failing to

 4 An individual may bring a hostile work environment claim based on

disability under the ADA. Ford v. Marion Cnty. Sheriff’s Off., 942 F.3d 839,
851–52 (7th Cir. 2019). Trahanas’s initial complaint made such a claim. But
after the district court dismissed the claim, Trahanas did not reallege it in
her second amended complaint, which is the operative complaint on the
parties’ motions for summary judgment.
14 No. 21-3278

rectify the problem. Accordingly, Northwestern is not liable
under Title VII for any alleged coworker harassment.
 B. FMLA and ADA Retaliation
 We next consider Trahanas’s retaliation claims. The FMLA
requires certain employers to provide their employees with
up to 12 weeks of unpaid leave each year for qualifying health
conditions. 29 U.S.C. § 2612(a)(1). And the ADA prohibits em-
ployers from discriminating against individuals based on dis-
ability. 42 U.S.C. § 12112(a). Both acts “prohibit employers
from retaliating against employees who assert their statutory
rights.” Freelain v. Vill. of Oak Park, 888 F.3d 895, 900 (7th Cir.
2018) (citing 29 U.S.C. § 2615; 42 U.S.C. § 12203)).
 The FMLA and ADA “are legally distinct, but in cases
claiming unlawful retaliation, the analyses … overlap.” Id.
Retaliation claims brought under either act “require three fa-
miliar elements: (1) the employee engaged in statutorily pro-
tected activity; (2) the employer took adverse action against
the employee; and (3) the protected activity caused the ad-
verse action.” Id. at 901. To succeed in showing causation, a
plaintiﬀ must demonstrate that “the protected conduct was a
substantial or motivating factor in the employer’s decision.”
Anderson v. Nations Lending Corp., 27 F.4th 1300, 1307 (7th Cir.
2022).
 1. Northwestern
 Trahanas argues that Northwestern unlawfully retaliated
against her for taking FMLA leave by terminating her em-
ployment and failing to hire her for another position at the
No. 21-3278 15

university. 5 Because the analysis for the FMLA and ADA re-
taliation claims overlap, we address them together. The par-
ties agree that Trahanas “engag[ed] in statutorily protected
activity by utilizing FMLA leave” for purposes of her FMLA
retaliation claim. Anderson, 27 F.4th at 1307. For this appeal,
we assume without deciding that taking FMLA leave consti-
tutes a statutorily protected activity under the ADA. 6 Conse-
quently, we focus on whether Northwestern took any adverse
actions against Trahanas and whether her taking FMLA leave
caused those actions.
 In the retaliation context, an employer’s action is adverse
if “the action would have ‘dissuaded a reasonable worker
from’ engaging in protected activity.” Freelain, 888 F.3d at
901–02 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548
U.S. 53, 68 (2006)). This objective standard is “based on how a
reasonable employee might react” in the plaintiﬀ’s circum-
stances. Id. at 902. Termination no doubt qualiﬁes as an

 5 In her complaint, Trahanas alleged Northwestern retaliated against

her for taking FMLA leave by locking her out of her work computer. The
district court addressed whether the computer lockout was an unlawful
retaliatory action in its summary judgment order. But Trahanas does not
argue that the computer incident was adverse on appeal, so we consider
the argument waived. EEOC v. Wal-Mart Stores E., L.P., 46 F.4th 587, 598
(7th Cir. 2022) (explaining that “arguments not raised in an opening brief
are waived”).
 6 To have engaged in an activity protected by the ADA, the employee

“must have asserted [her] rights under the ADA by either seeking an ac-
commodation or raising a claim of discrimination due to [her] disability.”
Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 814–15 (7th Cir.
2015). The record provides no evidence that Trahanas asserted her rights
under the ADA. Nonetheless, we operate under our assumption for con-
venience.
16 No. 21-3278

adverse action. In fact, the FMLA expressly prohibits dis-
charging an employee for exercising FMLA rights. 29 U.S.C.
§ 2615(a)(2); see also Anderson, 27 F.4th at 1307 (concluding that
an employee “experienced an adverse action when she was
terminated from her position”). The same goes for a failure to
hire. See Vance, 570 U.S. at 431 (deﬁning a tangible employ-
ment action to include “hiring [or] failing to promote”). Ac-
cordingly, we address whether a causal link exists between
Trahanas’s protected activity and Northwestern’s release of
her employment and subsequent failure to hire her for other
posts at the medical school.
 Viewing the facts in favor of Trahanas, she cannot show
that her FMLA leave played a motivating factor in Northwest-
ern’s decision to terminate her employment. Trahanas could
have chosen to return to her position in Schwulst’s lab follow-
ing her leave. Northwestern had held the position open, and
Schwulst expected her return. But Trahanas informed North-
western she would not come back to work, so Northwestern
terminated her position. In a letter sent to Trahanas in June
2015, Northwestern stated: “Since you have not returned to
work nor have you re-opened your [extended sick time]
claim, your position with Northwestern University has been
terminated.” FMLA leave was not a motivating factor in Tra-
hanas’s termination. Northwestern released her position be-
cause she neither returned to work nor reopened her leave
claim.
 Similarly, Trahanas provides no evidence tending to show
that her decision to take FMLA leave was a substantial or
motivating factor in Northwestern’s decision not to oﬀer her
another position. After her FMLA leave expired, Trahanas ap-
plied to other positions at Northwestern without success.
No. 21-3278 17

There is no evidence that those making hiring decisions for
these jobs knew she had taken FMLA leave. “[A] superior can-
not retaliate against an employee for a protected activity
about which he has no knowledge.” Stephens v. Erickson, 569
F.3d 779, 788 (7th Cir. 2009). Without knowledge of Tra-
hanas’s FMLA leave, hiring decisionmakers at Northwestern
could not have retaliated against her for that leave. Because
Trahanas failed to raise a genuine issue of material fact on
causation, the district court properly granted summary judg-
ment to Northwestern on the FMLA and ADA retaliation
claims.
 2. Schwulst
 Trahanas also claims Schwulst retaliated against her for
taking FMLA leave by withdrawing his letter recommending
her for medical school. She contends the withdrawal de-
stroyed her dream of attending medical school, her goal of be-
coming a doctor, and her professional reputation. Schwulst
responds he withdrew his recommendation based on ethical
concerns that Trahanas failed to document the status of an ex-
periment involving mice before she took leave. The district
court ﬁrst denied Schwulst summary judgment on the claim
because a reasonable jury could ﬁnd Trahanas’s FMLA leave
was a motivating factor in Schwulst’s decision to withdraw
his recommendation. On reconsideration, the district court
dismissed the claim against Schwulst because Trahanas failed
to allege an injury and thus had no standing. In the alterna-
tive, the court granted Schwulst summary judgment because
Trahanas had not suﬀered damages compensable under the
FMLA.
 Trahanas has standing to bring her FMLA retaliation
against Schwulst because in her complaint she alleged an
18 No. 21-3278

actual, concrete, and particularized injury in fact—damage to
her professional reputation and the denial of her medical
school applications. This court therefore has jurisdiction over
Trahanas’s claim. After discovery Trahanas failed to establish
that she suﬀered an injury in fact. So, her claim fails on the
merits, not for lack of standing. See Bell v. Hood, 327 U.S. 678,
682 (1946) (“If the court does later exercise its jurisdiction to
determine that the allegations in the complaint do not state a
ground for relief, then dismissal of the case would be on the
merits, not for want of jurisdiction.”); United States v. Von
Vader, 58 F.4th 369, 371 (7th Cir. 2023).
 The FMLA allows employees to recover for “wages, sal-
ary, employment beneﬁts, or other compensation” or “any ac-
tual monetary losses” that result from an employer’s FMLA
violation. 29 U.S.C. § 2617(a)(1)(A)(i)(I), (II). The statute also
authorizes courts to provide appropriate equitable relief, such
as “employment, reinstatement, and promotion.” Id. at
§ 2617(a)(1)(B). But unlike Title VII and the ADA, “FMLA
damages don’t include emotional distress and punitive dam-
ages.” Arrigo v. Link, 836 F.3d 787, 798 (7th Cir. 2016). To sur-
vive summary judgment, a plaintiﬀ must “come forward with
evidence from which a jury could conclude that [s]he suﬀered
damages attributable to one of these adverse actions for which
the FMLA provides relief.” Hickey v. Protective Life Corp., 988
F.3d 380, 388 (7th Cir. 2021).
 Trahanas fails to show she suﬀered damages from
Schwulst’s alleged retaliation. Schwulst uploaded his second
letter withdrawing his support of Trahanas’s medical school
candidacy to AMCAS on February 19, 2015. Of the ﬁfteen
schools Trahanas applied to in the 2014–15 cycle, nine rejected
her application prior to February 19. Five of the remaining six
No. 21-3278 19

schools considered her application withdrawn before that
date because she did not submit secondary materials. The sole
remaining school, Florida Atlantic University, labeled her ap-
plication as “Withdrew Before Accepted” by April 1, 2015.
Trahanas cannot recall whether she submitted secondary ma-
terials to Florida Atlantic University. Her lack of recollection
does not create a genuine dispute of material fact about
whether that university considered her application and de-
nied it due to Schwulst’s letter. See Tinder v. Pinkerton Sec., 305
F.3d 728, 735–36 (7th Cir. 2002) (concluding that a plaintiﬀ’s
lack of recollection did not create a genuine issue of material
fact). A reasonable juror could not conclude, based on this ev-
idence, that Schwulst’s second letter contributed to her rejec-
tion.
 Trahanas reapplied to four of the same schools in the
2017–18 cycle. Northwestern and Schwulst, through an expert
witness, oﬀered evidence that AMCAS does not retain letters
of recommendation submitted in earlier application cycles
and that medical schools only consider letters written for the
application cycle in which they are submitted. Trahanas
claims that conversations she had with admissions personnel
at various medical schools led her to believe otherwise. But
her bare allegations, without more, do not create genuine dis-
putes of material fact. No evidence in the record supports Tra-
hanas’s argument that any of the four schools to which she
reapplied had access to or relied upon the letters Schwulst
submitted in 2015. Because Trahanas fails to show that any
medical school rejected her based on Schwulst’s withdrawal
of his recommendation, Schwulst is entitled to summary
judgment on the FMLA retaliation claim.
20 No. 21-3278

 C. State Law Claims
 1. Defamation
 Trahanas’s defamation claim against Northwestern and
Schwulst is based on the letter Schwulst wrote rescinding his
initial letter of recommendation. The entire letter reads: “I am
writing to formally withdraw my prior letter of reference for
Ms. Diane Trahanas. I can no longer support her candidacy
for admission to medical school.”
 To establish defamation under Illinois law, a plaintiﬀ must
show “the defendant made a false statement about the plain-
tiﬀ, the defendant made an unprivileged publication of that
statement to a third party, and that this publication caused
damages.” L. Oﬀs. of David Freydin, P.C. v. Chamara, 24 F.4th
1122, 1129 (7th Cir. 2022) (quoting Solaia Tech., LLC v. Specialty
Publ’g Co., 852 N.E.2d 825, 839 (Ill. 2006)). If a statement’s “de-
famatory character is obvious and apparent on its face,” it is
considered defamation per se, and damages are presumed.
Bd. of Forensic Document Exam’rs, Inc. v. Am. Bar Ass’n, 922 F.3d
827, 831–32 (7th Cir. 2019) (quoting Tuite v. Corbitt, 866 N.E.2d
114, 121 (Ill. 2006)). Illinois recognizes “words that impute a
person lacks ability or otherwise prejudices that person in her
or his profession” as defamatory per se. Solaia Tech., 852
N.E.2d at 839.
 Defamatory statements “may enjoy constitutional protec-
tion as an expression of opinion.” Id. Whether “a statement is
a factual assertion that could give rise to a defamation claim”
or an opinion protected by the First Amendment “is a ques-
tion of law.” Imperial Apparel, Ltd. v. Cosmo’s Designer Direct,
Inc., 882 N.E.2d 1011, 1022 (Ill. 2008). In making that legal de-
termination, courts consider “whether the statement has a
No. 21-3278 21

precise and readily understood meaning; whether the state-
ment is veriﬁable; and whether the statement’s literary or so-
cial context signals that it has factual content.” Solaia Tech., 852
N.E.2d at 840. The constitution protects a defamatory state-
ment “only if it cannot be reasonably interpreted as stating
actual fact.” Id.
 Schwulst’s letter contains non-actionable, constitutionally
protected statements of opinion. The statements do not have
precise and readily understood meanings. There are numer-
ous reasons why Schwulst may have withdrawn his recom-
mendation. Without additional details, the letter cannot be
understood as “precise.” Cf. Hopewell v. Vitullo, 701 N.E.2d 99,
104 (Ill. 1998) (“‘[I]ncompetent’ is an easily understood term,
[but] its broad scope renders it lacking the necessary detail for
it to have a precise and readily understood meaning.”).
 More fundamentally, the letter does not contain state-
ments that can be objectively veriﬁed as true or false.
Schwulst’s retraction of support implies “undisclosed and un-
assumed facts that support [his] opinion.” Id. But based on the
letter alone, medical schools have no factual basis from which
to verify why Schwulst retracted his recommendation, mak-
ing it too ambiguous and indeﬁnite to constitute a statement
of fact. The vaguer and more generalized the “opinion[,] the
more likely the opinion is non-actionable as a matter of law.”
Id. at 104, 105 (holding that the alleged defamatory statement,
“ﬁred because of incompetence,” was “too vague and general
to support an action for defamation as a matter of law”). Be-
cause Schwulst’s letter does not contain a veriﬁable factual
statement about Trahanas, her defamation claim against him
fails. With no liability for Schwulst, Northwestern cannot be
held vicariously liable.
22 No. 21-3278

 2. Intentional inﬂiction of emotional distress
 Finally, Trahanas brings state-law claims against North-
western and Schwulst for intentional inﬂiction of emotional
distress. Illinois sets a “high bar” for intentional inﬂiction of
emotional distress claims. Richards v. U.S. Steel, 869 F.3d 557,
566 (7th Cir. 2017). A plaintiﬀ must show that: (1) the defend-
ant’s conduct was extreme and outrageous; (2) the defendant
intended that his conduct would cause severe emotional dis-
tress, or knew that there was at least a high probability that
the conduct would inﬂict severe emotional distress; and
(3) the conduct did in fact cause severe emotional distress. Id.
(citing Feltmeier v. Feltmeier, 798 N.E.2d 75, 80 (Ill. 2003)). To
qualify as outrageous, the conduct “must be so extreme as to
go beyond all possible bounds of decency and be regarded as
intolerable in a civilized society.” Richards, 869 F.3d at 566
(quoting Feltmeier, 798 N.E.2d at 80). “[M]ere insults, indigni-
ties, threats, annoyances, petty oppressions, or other triviali-
ties” do not suﬃce. Id. Regarding severity, the distress
inﬂicted must be “so severe that no reasonable person could
be expected to endure it.” Lifton v. Bd. of Educ. of City of Chi.,
416 F.3d 571, 579 (7th Cir. 2005); see also Schweihs v. Chase Home
Fin., LLC, 77 N.E.3d 50, 63 (Ill. 2016).
 Liability for emotional distress “is even more constrained
in the employment context.” Richards, 869 F.3d at 567. The
“everyday job stresses resulting from discipline, personality
conﬂicts, job transfers or even terminations” do not give rise
to emotional distress claims, otherwise “nearly every em-
ployee would have a cause of action.” Naeem v. McKesson
Drug Co., 444 F.3d 593, 605 (7th Cir. 2006) (quoting Graham v.
Commonwealth Edison Co., 742 N.E.2d 858, 867 (Ill. 2000)). To
obtain relief in the employment context, an employee must
No. 21-3278 23

show that an employer “clearly abuses the power it holds over
an employee in a manner far more severe than the typical dis-
agreements or job-related stress caused by the average work
environment.” Id.
 Viewing the evidence in Trahanas’s favor, her emotional
distress claims fail. To begin, it is unclear what conduct Tra-
hanas challenges as extreme and outrageous. She notes that,
according to her psychiatrist, she experienced worsening de-
pression and anxiety related symptoms during the time she
worked in the lab due to “multiple stressors,” including
“[i]ncreased job stress” and her “boss [ ] not being support-
ive.” Trahanas also points to the performance review meeting
with Schwulst, where she became upset and cried. Otherwise,
Trahanas fails to highlight other distressing conduct in sup-
port of her claim.
 Lack of support from a boss and a tense performance re-
view do not constitute extreme and outrageous conduct. Alt-
hough Trahanas became upset after meeting with Schwulst,
that did not produce more than the “job-related stress caused
by the average work environment.” Id. Indeed, “personality
conﬂicts and questioning of job performance are unavoidable
… [and] frequently, they produce concern and distress.” Rich-
ards, 869 F.3d at 567. But because the meeting did not go “well
beyond the parameters of the typical workplace dispute,” it
cannot be classiﬁed as extreme and outrageous. Lewis v. School
Dist. No. 70, 523 F.3d 730, 747 (7th Cir. 2008). The same is true
for Trahanas’s claim that Schwulst did not support her. Any
perceived lack of support by Schwulst does not amount to a
clear and severe “abuse of power” over Trahanas. Naeem, 444
F.3d at 605.
24 No. 21-3278

 After Trahanas had taken FMLA leave, her psychiatrist
recommended that she “not … return to her previous job” be-
cause the high-stress work environment would “likely lead to
psychiatric decompensation.” For Trahanas, this provides ev-
idence of the intentional emotional distress Schwulst and
Northwestern caused. Although Trahanas provides evidence
of emotional distress, she must still establish that Schwulst
and Northwestern’s conduct was extreme and outrageous
and that Schwulst and Northwestern intentionally sought to
inﬂict emotional distress. She does neither, so her emotional
distress claims against Schwulst and Northwestern fail.
 * * *
 For the reasons stated above, we AFFIRM the district court’s
grant of summary judgment to Northwestern and Schwulst
on all claims.