In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-2932

BANKRUPTCY ESTATE OF SANTOASHA HARRIS,

*Plaintiff-Appellant,*

*v.*

CITY OF MILWAUKEE, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:20-cv-00609 — **Nancy Joseph**, *Magistrate Judge.*

_____

ARGUED MAY 16, 2024 — DECIDED JUNE 24, 2025

_____

Before EASTERBROOK, RIPPLE, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* For five years, Santoasha Harris endured sexual harassment at her City of Milwaukee job. When she reported the conduct, the City separated Harris from the harasser, conducted an investigation, compelled the harasser's resignation, and restored Harris to her position— within one month.

Harris sued the City, arguing it knew about the harassment for years, failed to do anything, and instead retaliated against her for reporting it. Because Harris had also filed for bankruptcy, the district court allowed the substitution of her estate as the named plaintiff. The district court granted summary judgment to the City. The court concluded, among other things, that Harris's Estate had not shown the City unreasonably failed to prevent the harassment or that she suffered a tangible employment action as a consequence for reporting it. Although the harassment Harris survived was both reprehensible and injurious, we agree that the evidence in the record does not support the Title VII and Section 1983 claims against the City. We therefore affirm the judgment.

**I**

We recount the facts in the light most favorable to Harris's Estate as the party opposing summary judgment. *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 889 (7th Cir. 2024). In 2007, Harris began working at the City's Department of Public Works as an infrastructure repair worker. Harris was assigned to the Department's barricade shop, which constructed and repaired street barricades. According to her job description, a laborer in Harris's position was supposed to allocate five percent of her time to barricade work, while trash removal and other outdoor tasks captured anywhere from ten to seventy percent of her remaining duties.

In 2010, Terrence Brumirski became a plant and equipment repair supervisor responsible for overseeing several individuals at the barricade shop. From 2012 to 2017, Brumirski subjected Harris to egregious forms of sexual harassment. On more than one occasion, Brumirski attempted to grab her

buttocks, kiss her, place her on his lap, and touch her in inappropriate ways. Brumirski also tried to pressure Harris into performing sexual acts on him at work.

The City maintained an anti-harassment policy that instructed victimized employees to immediately report instances of sexual harassment to their supervisor, department manager, or the Office of Diversity staff, among others. These people would, according to the City's policy, provide confidential assistance to resolve the issue before filing a formal complaint. Under the policy, a formal investigation would not begin unless an employee provided the City with a signed, written complaint. And employees could not be retaliated against for filing a complaint or assisting with an investigation. Despite receiving the City's anti-harassment policy four times between 2006 and 2011, Harris did not formally report Brumirski to the City until 2017.

Harris says she reported Brumirski's conduct in 2012, when the harassment was just starting. She explains that she sent copies of an anonymous letter, dated July 30, 2012, to three people: Brumirski's live-in girlfriend, a City alderman whose identity she could not remember, and Dan Thomas, who at the time served as the Department's personnel compliance manager. According to Harris, she dropped the letters in a mailbox without a return receipt, hoping that this would initiate an investigation. As to Thomas's letter specifically, she addressed it with his full name and an address for the City. Thomas claims he never received the letter.

Harris also says she told her friend and coworker, Detria Hardnett, about the harassment in 2012. In response, Hardnett apparently offered to accompany Harris to the barricade shop to dissuade Brumirski's advances. At that point,

Hardnett had recently become a repair worker crew leader. This new title offered her a minimal raise, but did not otherwise bestow new responsibilities that separated her from laborers like Harris. Hardnett did not assume a supervisory position until 2017.

Despite Harris's efforts, Brumirski's conduct worsened. On May 25, 2017, Brumirski put his hand down Harris's pants and fondled her genitalia. That same day, one of Harris's coworkers reported seeing that Harris was visibly upset. That coworker had previously instructed Brumirski to leave Harris alone.

Less than a week after this incident, on May 30, 2017, Harris's attorney sent a letter to Thomas notifying him that Harris would be seeking damages for Brumirski's sexual harassment. After receiving the letter, Thomas immediately separated Brumirski and Harris by temporarily assigning Harris to the sanitation division, where part of her duties included picking up trash. Thomas also contacted Harris and her attorney to gather evidence and investigate any leads, and suspended Brumirski for the duration of the investigation.

Thomas interviewed multiple employees. No one corroborated Brumirski's harassment of Harris. However, Thomas spoke to one employee, Paulette Lee, who also claimed that Brumirski sexually harassed her. Lee provided several text messages and photos to corroborate Brumirski's harassment. According to Thomas, because of Lee's report, the City decided to offer Brumirski the choice to resign or be terminated. Brumirski resigned on July 3, 2017, concluding the approximately one month-long investigation. Shortly thereafter, Harris returned to the barricade shop.

When Harris returned to her original position, she did not like what she found. Before her reassignment, she had a makeshift desk, but the City had removed it. Harris also noticed the City had installed a camera in the vicinity where she used to work. And Harris claimed that Hardnett, who had become her supervisor, stopped talking to her for fear of being recorded. Harris felt the City made these changes to retaliate against her for reporting Brumirski's conduct.

After her return, Harris applied for two positions, one of which had been Brumirski's position of plant and equipment repair supervisor. The positions required experience as a street repair supervisor, which Harris did not have. The City denied Harris's applications. As it turns out, Hardnett became the permanent plant and equipment repair supervisor. In her new role, Hardnett had Harris, along with everyone she supervised, pick up trash around the Department's headquarters building. Harris similarly viewed this as a form of retaliation.

Harris sued several defendants including the City of Milwaukee. She alleged violations under Title VII, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1983, for sexual harassment and discrimination, hostile work environment, and retaliation. The City moved for summary judgment on all claims, and the district court granted the motion.

Harris's Estate maintains the district court erred in dismissing the Title VII and Section 1983 claims. We review appeals of summary judgment de novo. *Adebiyi*, 98 F.4th at 891. In doing so, we construe the record in the light most favorable to the Estate and draw all reasonable inferences for it. *Id.* But we find no error in the district court's judgment.

## II

We begin with the Estate's claims under Title VII for sexual harassment and discrimination. The Estate presents two separate theories of why the City is liable: (1) for Brumirski's quid pro quo harassment of Harris and (2) for the hostile work environment Brumirski's harassment created. Given the elements of these claims, however, we, like the district court, conclude that no reasonable juror could find the City liable.

### A. Quid Pro Quo Harassment

In *Bryson v. Chicago State University*, our court identified a five-part test used by other courts of appeals in quid pro quo cases but left open the question of whether the test "perfectly capture[d]" quid pro quo harassment. 96 F.3d 912, 915–916 (7th Cir. 1996). The test asks whether the plaintiff has shown "(1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established." *Id.* at 915.

The parties dispute only the fourth and fifth elements. Because our inquiry turns on the fourth element—which, as explained below, the Estate cannot overcome—we do not revisit the open question about the test's suitability. We do not reach the final element either. Both parties present persuasive arguments about whether Brumirski was Harris's supervisor, a factual predicate for the Estate's respondeat superior theory to prevail. But we begin and end with the fourth element, and agree with the district court: the Estate failed to establish that

Harris's reaction to Brumirski's advances affected a tangible aspect of Harris's employment as recognized by our caselaw.

The fourth element really asks two questions: (a) "what was the 'tangible employment benefit' that was denied to [the employee]" and (b) "was the denial a result of [the employee's] refusal to submit to [the harasser's] demands?" *Bryson*, 96 F.3d at 916. Whether an employment benefit is tangible "will normally depend on the facts of each situation." *Id.* "[A] wide variety of actions, some blatant and some subtle, can qualify." *Id.* These include, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (herein *Ellerth*)). For example, we have found tangible employment actions where a principal confiscated the supplies a teaching intern needed to do her assigned job, *see id.*, and where a tenured professor suddenly lost all committee responsibilities and had her title stripped, *see Bryson*, 96 F.3d at 916.

The Estate does not argue that Brumirski ever took an employment action against Harris. Instead, the Estate asserts that Brumirski threatened Harris with reassigning her to outdoor work if she did not cooperate with his incessant and invasive advances. But even if Brumirski had the authority to assign Harris to outdoor work—a matter the parties contest—no reasonable juror could find that such an assignment would have affected a tangible aspect of Harris's employment. This is because the bulk of Harris's job functions were for outdoor work. According to the job description for Harris's laborer

position, only five percent of the work involved barricades. Even this function could take place outdoors, and not solely inside the barricade shop, because it required laborers to "[p]lace and install barricades, guard rails, thrie beams, signage, etc." The remaining job functions—up to seventy percent of a laborer's duties—involved working outside to assist pavement repair and bridge maintenance crews. The threat of an assignment to duties so clearly outlined in Harris's job description cannot constitute a tangible employment action.

Even without a tangible employment action, an employer can be held liable for an employee's harassment. But not if the employer can show "(1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that [the employee] unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise." *Molnar*, 229 F.3d at 600 (citing *Ellerth*, 524 U.S. at 765 & *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). This is otherwise referred to as the *Faragher-Ellerth* defense. *Id.*

Here, the City has satisfied both prongs of the *Faragher-Ellerth* defense. First, the City exercised reasonable care to prevent and promptly correct Brumirski's sexually harassing behavior. We have held that the "mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace." *Passananti v. Cook Cnty.*, 689 F.3d 655, 673 (7th Cir. 2012). Instead, a company's policy must give employees a meaningful process to express their concerns about an individual in their work environment. *Id.* Beyond appearing "reasonably effective on paper …. [t]he policy also must be reasonably effective in practice." *Id.* at 673–74. For example, in

*Trahanas v. Northwestern University*, we found that Northwestern's policy prohibiting discrimination and harassment, which was included in its staff handbook, sufficed because it "provided instructions and multiple avenues—including those outside an employee's supervisory chain of command—for filing complaints." 64 F.4th 842, 854 (7th Cir. 2023).

The City has met its burden of showing both the existence and effectiveness of its formal anti-harassment policy. The City distributed the policy to employees in its "Major Work Rules" packet. Harris received this packet on at least four separate occasions before Brumirski's sexual harassment began in 2012. The policy outlines several avenues for employees seeking confidential assistance or wanting to file a formal complaint, including the Office of Diversity staff, the departmental Complaint Intake Advisor, and the Human Resources Compliance Officer, all offices outside of Harris's chain of command.

In addition to having an effective anti-harassment policy on paper, the City's actions in addressing Harris's 2017 complaint support a finding that the policy was reasonably effective in practice. Harris's attorney sent a formal complaint to the City on May 30, 2017. Almost immediately, Thomas separated Brumirski and Harris, contacted Harris's attorney to gather evidence, placed Brumirski on administrative leave, and began interviewing witnesses. Once Thomas found another employee's allegations against Brumirski were corroborated, the City instigated Brumirski's resignation on July 3, 2017. It took the City roughly one month to complete the investigation, address Brumirski's conduct, and return Harris to the barricade shop. Nothing about this chronology

suggests the City failed to promptly address Brumirski's behavior.

The City has satisfied the second prong of the *Faragher-Ellerth* defense too. Until her attorney's letter in 2017, Harris unfortunately did not take advantage of the City's avenues for reporting and addressing Brumirski's sexual harassment. There is no evidence in the record that Harris informed a supervisor or any of the offices delineated in the policy outside of her chain of command. Although Harris claims she told Hardnett about Brumirski's conduct at some point in 2012, Hardnett did not assume a supervisory position until 2017. As for Harris's anonymous letter in 2012, there is no evidence in the record to establish when the letter was drafted, what date it was delivered, or that Thomas received the copy sent to a City address. There is also no evidence that Harris ever sought to confirm that Thomas had received the letter, or that she sought confidential assistance from him otherwise. Further, Harris testified she intended the letter to trigger an investigation into Brumirski, but her attempt did not comply with the City's policy that a complainant submit a "signed, written statement."

On this record, no reasonable jury could find that Harris took advantage of the City's reporting mechanisms before 2017, that the City acted unreasonably once Harris reported the harassment, or that Harris suffered a tangible employment action at Brumirski's hands. The district court did not err in rejecting the Estate's quid pro quo theory of harassment.

**B. Hostile Work Environment**

A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023). To establish this claim under Title VII, a plaintiff must show: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* The standard for evaluating an employer's liability depends on whether the harasser was the victim's supervisor or coworker. *Trahanas*, 64 F.4th at 853.

"If the harasser is a 'supervisor,' the employer is strictly liable and can only escape that liability if no tangible employment action had been taken, and the employer establishes [a *Faragher-Ellerth* defense]." *Equal Emp. Opportunity Comm'n v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387, 405 (7th Cir. 2024) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)); *Trahanas*, 64 F.4th at 853–54. If the harasser is a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Id.* at 853. "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed" is relevant to a determination of negligence. *Vance*, 570 U.S. at 449.

The parties dispute whether Brumirski acted as Harris's supervisor, and thus the standard to evaluate the City's liability. Again, although both parties present persuasive arguments about whether Brumirski was Harris's supervisor, we need not reach the issue. This is because the Estate's claim of hostile work environment fails under either standard of liability.

Assuming, as the Estate argues, that Brumirski was a supervisor, the Estate has not shown there was a tangible employment action affecting Harris, as explained earlier. At the same time, the City has presented evidence to support its *Faragher-Ellerth* defense.

Assuming Brumirski was a coworker, the Estate must show that the City acted negligently in controlling the working conditions at the Department. *Trahanas*, 64 F.4th at 853. To do this, the Estate argues that the City was negligent in training its supervisors on how to report sexual harassment. The Estate points to three supervisors as examples, but none succeed.

The first example is Hardnett. Harris says she told Hardnett about the harassment in 2012. But there is no evidence that Hardnett was a supervisor then; the record shows she became a supervisor in 2017.

The second and third examples are Brian Stankowitz[1] and Rico Lopez who, according to Harris, supervised a laborer named Carrie Graves. Graves alleged that Brumirski told her he would "rape her in the truck wash before he retired." According to the Estate, the City fostered a hostile work environment because Graves reported Brumirski's misconduct to Stankowitz and Lopez and they did nothing to stop it.

The record does not bear out the Estate's characterization of Stankowitz's response as doing nothing. When Graves informed Stankowitz of Brumirski's comment, Stankowitz

---

[1] At summary judgment and on appeal, the Estate refers to this individual as Brian Stankiewicz. Graves's deposition refers to him as Brian Stankowitz. It is clear from the record the parties are referring to the same person.

counseled Graves to keep a journal to assist with an investigation. Although Graves kept a journal, she acknowledged she never shared it with anyone, not even Stankowitz or human resources. This circumstance does not amount to a hostile work environment fostered by the City. *See Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1023–24, 1029–31 (7th Cir. 2004) (finding an employer had not been negligent in uncovering an employee's complaint of racial harassment by coworkers where the employee initially failed to report the incident, despite his supervisor approaching him about his experience).

As for Lopez, the Estate does not offer any support for its assertion that he held a supervisory role. Although the Estate's summary judgment brief refers to Lopez as an "Inventory Services Manager," Graves testified that she did not know Lopez's role at the time of Brumirski's misconduct. And the Estate does not direct us to any evidence to address this confusion. Accordingly, we are unable to evaluate the Estate's claim that Lopez failed to carry out supervisory duties under the anti-harassment policy. *See Draper v. Martin*, 664 F.3d 1110, 1113 n.5 (7th Cir. 2011) ("[T]he [p]laintiffs fail to offer any record citations or analysis supporting such a claim and we 'will not hunt through the record' looking for corroborating evidence.").

In sum, regardless of whether Brumirski was Harris's supervisor or her coworker, no reasonable jury could find a basis for employer liability. The Estate's hostile work environment claim thus fails as a matter of law.

### III

We turn next to the Estate's claim of retaliation, which she has asserted under both Title VII and Section 1983. Because claims of retaliation fall under the exclusive province of Title VII, we address the claim under the Title VII framework only. *See Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("[The] right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause. Section 1983 provides a remedy for deprivation of constitutional rights. It supplies no remedy for violations of rights created by Title VII." (citation omitted)). Title VII prohibits an employer from retaliating against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (quoting 42 U.S.C. § 2000e-3(a)).

To survive summary judgment, the Estate must offer evidence that allows a reasonable jury to find that "(1) [Harris] engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the two." *Adebiyi*, 98 F.4th at 891.

When looking at whether the plaintiff suffered an adverse employment action for retaliation claims, the harm threshold is higher than that of direct discrimination claims. Rather than causing "some harm," an action in the retaliation context must be materially adverse, meaning that it causes "significant" harm. *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, 357–58 (2024) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (herein *White*)); *see also Lesiv v. Ill. Cent. R.R.*

*Co.*, 39 F.4th 903, 912 (7th Cir. 2022) (holding that a retaliatory action must "rise above trivial harms, such as petty slights or minor annoyances that often take place at work and that all employees experience" (cleaned)). A materially adverse action is one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Muldrow*, 601 U.S. at 357 (citing *White*, 548 U.S. at 68).

The district court rejected the Estate's retaliation claim because the record did not show Harris suffered an adverse employment action. We agree. And even if the Estate had prevailed on this point, it similarly fails to show more than mere temporal proximity between Harris's report of sexual harassment and the actions she identifies as adverse—reassignment to trash duty, altered work schedule, removal of a makeshift desk, and alleged isolation upon her return. Yet, "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). We address each of the Estate's proposed retaliatory actions in turn.

The Estate offers Harris's reassignment to trash duty as proof of retaliation. But the record supports the contrary conclusion. The day the City heard from Harris's attorney, it transferred Harris to another department to separate her from Brumirski during the investigation. An employer's decision to temporarily separate two workers in the face of sexual harassment allegations is not an adverse employment action. *See Place v. Abbott Lab'ys*, 215 F.3d 803, 811 (7th Cir. 2000) (finding that "an employer's decision to split up two workers whose interpersonal problems [were] impeding the company's progress [was] not retaliation").

When Harris returned to the barricade shop, she continued to receive assignments to pick up trash around the building, now from Hardnett as her new supervisor. According to the Estate, Hardnett's assignments were retaliation for Harris having brought Hardnett into the sexual harassment investigation. But there is no evidence to support this theory. In fact, Hardnett testified that she assigned every employee she supervised to pick up trash. The Estate does not refute Hardnett's testimony. Instead, it takes issue with Harris not having been asked to perform this duty before. Although trash pickup and other outdoor tasks may have been new for Harris, these tasks were not outside her responsibilities. According to the City's job description, trash-related responsibilities fell within ten to seventy percent of Harris's laborer job function. Further, as Thomas explained, it was not uncommon for laborers to work in different parts of barricade infrastructure, which could include both indoor and outdoor work. As we have explained, "[a] materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 761 (7th Cir. 2016). Moving from one function to another within a job, when nothing guarantees the employee will always remain assigned to the same function, does not amount to an adverse employment action.[2] *See Place*, 215 F.3d at 810 (finding a

---

[2] The Estate likewise alleges that Harris's trash assignments have diminished her prospects for promotion. For support, the Estate cites only testimony from Graves, a coworker who has worked for the City's street cleaning department since approximately 2012 but has never held a managerial, supervisory, or administrative position. Graves testified that she was not aware of any trash pickup position that would lead to a

transfer could not amount to an adverse employment action where "[t]here was no guarantee that [the employee] would remain forever in the job she held before her transfer," and the industry at issue was "a dynamic business that involve[d] regularly shifting people from one job to another"). Here, there is no evidence that Harris was guaranteed solely to construct and repair barricades, a mere five percent of her job description.

Next, the Estate claims the City retaliated against Harris by changing her work schedule. During the City's month-long investigation, Harris's schedule changed from 6:00 a.m. to 2:30 p.m., to 7:00 a.m. to 3:30 p.m. Harris explains this forced her to arrange an additional hour of childcare for several weeks. She did not report this impact to Thomas, and her schedule went back to normal when she returned to the barricade shop. Although we recognize the added stress Harris faced that month, a reasonable jury would not conclude that a temporary one-hour schedule change during a sexual harassment investigation would dissuade a reasonable employee from coming forward with sexual harassment complaints. This is especially true where the change was not accompanied by reduced pay or significantly diminished job responsibilities—harms the Estate does not claim Harris suffered.

The Estate presents as additional evidence of retaliation the City's removal of Harris's makeshift desk and the placement of a camera in the vicinity of her workspace. As the Estate explains it, Harris no longer had a sense of comfort in her environment without the makeshift desk, and was subjected

promotion. Graves's testimony is an insufficient basis on which a jury can infer anything about the City's promotion policy.

to harsh, cold winds in the winter. We understand Harris's genuine discomfort. But these changes do not amount to an adverse employment action, especially when the Estate has not shown that Harris required a desk to complete her duties, most of which could involve outdoor assignments like snow shoveling and concrete removal. *Cf. Place*, 215 F.3d at 810 ("Some of her complaints—losing her telephone and cubicle—are too trivial to amount to an adverse employment action. Maybe her new working quarters were not as nice, but there is no indication they were shabby or unpleasant."); *Molnar*, 229 F.3d at 600 (finding a tangible employment action when a jury could find that confiscated supplies were "necessary" to perform the assigned job).

As for the camera, the City presented unrefuted evidence that there are surveillance cameras throughout the Department. Even if the City placed the camera at issue close in time to Harris's return to the barricade shop, this temporal proximity is insufficient. *See Davis*, 651 F.3d at 675 (underscoring "the importance of context" when assessing suspicious timing). And the Estate does not offer any evidence to support its speculation that the City wanted to monitor Harris and make her feel uncomfortable.

The Estate's last asserted evidence of retaliation is that the City failed to give Harris performance reviews and isolated her in the barricade shop. Harris recounted an instance when she worked with a coworker on a barricade project and a manager from another department congratulated only the coworker on the joint work. Harris also described how employees stopped holding the door for her or greeting her in the mornings. On another occasion, she recalled, Hardnett allowed several other employees in her Department, but not

Harris, to leave thirty minutes early. Although the withholding of a performance review might be cause for concern, the Estate does not offer any argument about how this relates back to Harris's protected activity. On the record before us, none of the remaining isolated and general allegations permit a finding of retaliatory conduct.

Because no reasonable jury could find that the Estate established two elements necessary for the success of a retaliation claim—an adverse employment action and causation—the district court did not err in granting the City's summary judgment on the Estate's retaliation claim.

## IV

The Estate pursues a final claim under § 1983 that the City violated Harris's rights under the Fourteenth Amendment's Equal Protection Clause. This Court has held that "[s]exual harassment by a state employer constitutes sex discrimination in violation of the equal protection clause." *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006), *as amended* (July 6, 2006) (citing *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986)). The Estate contends that its claim succeeds if we apply the same reasoning in *Bohen*. But the Estate's case is materially distinguishable from *Bohen* in several ways.

In *Bohen*, we held the employer liable based on a practice and custom of permitting sexual harassment, evident from the employee having suffered "many instances of sexual harassment[,] often complain[ing] of [the harassment] through official channels, but that nothing was done." 799 F.2d at 1187. The employer lacked a written sexual harassment policy, and we concluded that it was "clear that supervisory department officials *knew* of the sexually oppressive working conditions

even before Bohen was hired since they warned her of them during an office interview." *Id.* (emphasis added). Inherent in this finding is the Equal Protection Clause's protection against "intentional discrimination." *See de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) ("The Equal Protection Clause protects against intentional discrimination on the basis of race or national origin, and 42 U.S.C. § 1983 provides an employee subjected to such discrimination a path to relief.").

Here, the City is unlike the employer in *Bohen* because there is no evidence that the City's supervisory department knew about Brumirski's misconduct until 2017, when Harris's attorney reported it to Thomas. The City also had a written policy that it distributed to its employees. And once Harris availed herself of the City's complaint process, the City, unlike the employer in *Bohen*, acted almost immediately to address and prevent any future sexual harassment. Because no reasonable jury could find intentional discrimination, the Estate cannot prevail on its equal protection claim.

## V

No employee should have to endure the sexual harassment Harris endured. But to survive summary judgment and have a trial seeking to hold the City liable for Brumirski's conduct, the Estate had the burden to present evidence demonstrating genuine dispute about whether Harris experienced a tangible or adverse employment action. It did not do so. Meanwhile, the City presented evidence that it took responsive and appropriate actions once Harris formally reported Brumirski. The record does not permit us to conclude that a

reasonable jury could find for the Estate on its claims against the City.

AFFIRMED.